FILED
United States Court of Appeals
Tenth Circuit

September 30, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

RANDOLFO LIBRADO CHAVEZ, JR.,

  Defendant - Appellant.

No. 17-8096

---

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 2:17-CR-00111-ABJ-2)**

---

Neil D. Van Dalsem, Assistant Federal Public Defender (Julia L. O'Connell, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Northern & Eastern Districts of Oklahoma, Tulsa, Oklahoma, for Defendant-Appellant.

Timothy Forwood, Assistant United States Attorney (Mark A. Klaassen, United States Attorney, with him on the brief), Office of the United States Attorney, Cheyenne, Wyoming, for Plaintiff-Appellee.

---

Before **HARTZ**, **SEYMOUR**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

Defendant-Appellant Randolfo Librado Chavez, Jr., was convicted, after a jury trial in the federal district court in Wyoming, of two counts of distributing methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). His appeal from those convictions centers on the district court's admission into evidence of three transcripts, which purportedly were of audio recordings of incriminating conversations that he had had in Spanish and in English. The district court did not admit into evidence the audio recordings themselves or play the recordings for the jury. Furthermore, the district court instructed the jury that they could not question the accuracy of the English-language translations in the transcripts.

On appeal, Mr. Chavez challenges both the district court's admission of the transcripts and the jury instructions relating to them. He argues that the district court (1) violated the best-evidence rule by admitting the transcripts into evidence without admitting the recordings themselves, and (2) committed plain error by instructing the jury to accept the accuracy of the translations in the transcripts.

As to Mr. Chavez's first contention, we conclude that the district court's admission of the transcripts, without also admitting the recordings they purported to transcribe, violated the best-evidence rule and constitutes reversible error. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **reverse and remand** the case to the district court with instructions to **vacate** Mr. Chavez's

convictions and grant him a new trial. In light of this disposition, we do not reach the merits of Mr. Chavez's jury-instruction challenge.

**I**

We start by surveying (A) the events on which the audio recordings and transcripts are predicated, (B) the contents of the recordings and the transcripts, and (C) the district court's admission of the transcripts at trial.

**A**

The relevant events trace back to July 2016, when Bryan Salas agreed to serve the Wyoming Division of Criminal Investigation ("WDCI") as a confidential informant in exchange for the removal of a misdemeanor theft charge from his record. Mr. Salas advised WDCI Special Agent Jason Ruby that he knew of people in the Gillette, Wyoming, area involved in the sale of methamphetamine and that he could arrange controlled purchases of the drug from them. To that end, working with several WDCI agents, Mr. Salas arranged to purchase four ounces of methamphetamine from a former co-worker named McKleen Miranda[1] on July 22. The agents gave Mr. Salas $4,000 to buy the four ounces of methamphetamine, and they outfitted him with a wire that would record audio and transmit it live to the agents.

---

[1] Mr. Miranda was indicted with Mr. Chavez in this case but testified at trial for the government.

On July 22, the day of the controlled purchase, the wire recorded a call that Mr. Salas allegedly received from Mr. Miranda. Because the conversation was largely in Spanish, the agents did not understand what they were saying, so Mr. Salas informed them later about the conversation's contents. *See* R., Vol. III, at 102, 111–12 (Tr. Jessie Lile's Test., dated Oct. 3, 2017). Mr. Salas told the agents that Mr. Miranda had informed him that "they [i.e., Mr. Miranda and one or more unidentified individual(s)] had the four ounces of methamphetamine" that he had requested, and that "they wanted to meet at Walmart in Gillette." *Id.* at 102. At the last minute, the location of the drug purchase changed from Walmart to the parking lot of a nearby Old Chicago pizza restaurant.

The trial testimony presented slightly conflicting stories about precisely what took place in the Old Chicago parking lot. Mr. Salas testified that he was the first to arrive and that a white four-door car occupied by Mr. Miranda, Mr. Chavez, and a person he did not know eventually pulled up next to his car. He recounted that one of the white car's windows rolled down and that Mr. Chavez then handed him the methamphetamine in exchange for cash. Mr. Miranda, on the other hand, testified that he, Mr. Chavez, and Mr. Miranda's brother-in-law, Carlos Dominguez, were the first to arrive in the white four-door car and that Mr. Salas subsequently showed up and pulled up next to their car. As for the drug handoff, Mr. Miranda testified that Mr. Chavez initially rolled down a window in

4

their white car, but when Mr. Salas's car window failed to open, Mr. Salas opened his car door instead and then exchanged Mr. Chavez's methamphetamine for cash.

None of the law enforcement officers who were at the scene were able to confirm either specific account. At most, one of them testified that he "could see that there were definitely two occupants in the white car," *id.* at 183 (Tr. Eric Vos's Test., dated Oct. 3, 2017), while another testified that he could hear "other people talking" over the live wire transmission, *id.* at 106. But that was the full extent of what they could ascertain: none of them could see who was inside the white car, much less identify Mr. Chavez as one of its occupants. The testimony is consistent, however, in conveying that the entire interaction between occupants of the two cars was brief, lasting somewhere between approximately "15 or 30 seconds" and one minute. *Id.* at 142 (Tr. Bryan Salas's Test., dated Oct. 3, 2017); *see id.* at 106 (officer testifying that the meeting lasted "right around the one-minute mark").

After the cars parted, Mr. Salas and the agents returned to the WDCI office, where the agents collected from Mr. Salas a bag containing methamphetamine. The methamphetamine weighed 3.55 ounces, falling short of the four ounces that Mr. Salas had been instructed to purchase. Accordingly, at the agents' request, Mr. Salas contacted Mr. Miranda about the methamphetamine shortage. Then, pertaining to a separate matter, Special Agent Ruby asked Mr. Salas also to

contact Mr. Miranda to inquire into "another individual that [Special Agent Ruby] was trying to activate a case on." *Id.* at 231–32 (Tr. Jason Ruby's Test., dated Oct. 3, 2017).

Three days later, on July 25, Mr. Salas visited Mr. Miranda's home. Special Agent Ruby indicated that the purpose of the visit was for Mr. Salas to inquire into the aforementioned person of interest. But while Mr. Salas was at Mr. Miranda's home, Mr. Salas acquired—without Special Agent Ruby's authorization—the approximately half-ounce of methamphetamine that had been missing from the July 22 controlled purchase. Shortly after leaving Mr. Miranda's home with the approximately half-ounce of methamphetamine, Mr. Salas contacted Special Agent Ruby and told him that he had just acquired from Mr. Miranda "the methamphetamine that [had been] shorted from the deal on the 22nd [of July]." *Id.* at 231.

Mr. Salas then met Special Agent Ruby at the WDCI office at the special agent's request. Special Agent Ruby took from Mr. Salas what he had obtained from Mr. Miranda, which Special Agent Ruby described as "a potato chip bag" containing "a paper towel or napkin-type substance," inside of which "was a plastic bag that contained a crystalline substance similar to methamphetamine." *Id.* at 232. Special Agent Ruby "admonish[ed]" Mr. Salas for acquiring the remaining methampetamine from Mr. Miranda without the participation of WDCI

6

agents. *Id.* at 234–35. Two days later, Mr. Salas was arrested for driving under the influence ("DUI").

Despite Mr. Salas's unauthorized acquisition of the remaining methamphetamine as well as his DUI arrest, WDCI agents continued to work with him. Sometime shortly after July 22, Special Agent Ruby contacted Mr. Salas and asked him to set up another controlled purchase of methamphetamine. Mr. Salas told Special Agent Ruby that Mr. Chavez had already contacted him about whether he needed more methamphetamine, and Special Agent Ruby asked Mr. Salas to arrange to have Mr. Chavez sell him four more ounces of methamphetamine. Mr. Salas and Mr. Chavez allegedly arranged for this second purchase to take place on August 3 in the Walmart parking lot.

On August 3, WDCI agents again provided Mr. Salas with cash and outfitted him with a wire. At Special Agent Ruby's request, Mr. Salas called Mr. Chavez to advise him that he was heading to Walmart. Mr. Salas arrived first at Walmart, where he waited inside for Mr. Chavez. Eventually, a white car pulled up to the store, and Mr. Salas got in.

Mr. Salas testified that there were two people in the car: Mr. Chavez and Mr. Dominguez. According to Mr. Salas, a conversation took place in the car between Mr. Chavez and himself, during which Mr. Chavez said that he did not have all four ounces of methamphetamine that Mr. Salas had requested. Mr.

7

Chavez also allegedly said, at some point during this conversation, "I am the boss. I can get you anything that you want." *Id.* at 152. Mr. Salas further testified that Mr. Chavez handed him the lesser amount of methamphetamine he had been able to procure, and that Mr. Salas handed Mr. Chavez a corresponding amount of cash in exchange.

Agents at the scene of the August 3 transaction presented a less definitive picture of what transpired, testifying that they were unable to ascertain exactly how many people other than Mr. Salas were in the white car, nor could they identify precisely who those other people were. In terms of what actually happened in the car, agents testified that they listened in on an approximately six-minute-long conversation between the vehicle's occupants, which was mainly carried out in Spanish, but that they were unable to understand the Spanish-speaking portions of it. Moreover, the agent charged with surveilling the white car while Mr. Salas was inside it testified that he could not see into the car and thus did not observe any "drugs being handed off and exchanged for money." *Id.* at 299, 302 (Tr. Chris McDonald's Test., dated Oct. 4, 2017).

The agents eventually observed Mr. Salas exit the white car, which then drove off. Mr. Salas walked back into Walmart. Shortly thereafter, Special Agent Ruby picked him up and returned with him to the WDCI office. There, Mr.

Salas provided Special Agent Ruby with the methamphetamine that he had purportedly received during the controlled purchase.

Meanwhile, a Gillette Police Department officer, who had been charged with stopping the white car and identifying its occupants, pulled the car over a short distance away from Walmart. The white car contained two people. The person in its passenger seat identified himself as "Randolfo Chavez," but he told the officer that he did not have an ID on him. No one was arrested, nor were any citations issued, and the officer ultimately let the car go. At trial, the officer identified Mr. Chavez as the person who was sitting in the white car's passenger seat during the traffic stop. *Id.* at 305, 308 (Tr. Ryan Warney's Test., dated Oct. 4, 2017).

**B**

It was against this backdrop that the government charged Mr. Chavez with two counts of distributing methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Count One pertained to the July 22 controlled buy, and Count Two pertained to the August 3 controlled buy. At trial, the government's case against Mr. Chavez rested in substantial part on three transcripts: Trial Exhibits 15, 16, and 17. These transcripts purportedly reflect audio recordings of conversations that Mr. Chavez had in both Spanish and English in connection with the July 22 and August 3 controlled buys, except that the Spanish-language portions have

9

been translated into English. The district court's admission of these transcripts is at the center of this appeal. Accordingly, before turning to our analysis, we first describe the content of these transcripts.

**1**

Exhibit 15 is a transcript that purportedly reflects the contents of an audio recording from the July 22 controlled drug purchase. *See id.*, Vol. IV, Ex. 15 at 1 (entitling exhibit, "Transcript of audio 7-22 Controlled Buy"). The transcript is formatted as a table, consisting of nine rows and four columns. Each individual row contains information pertaining to a statement[2] purportedly captured on the recording. The first column identifies each statement by number, in ascending numerical order. The second column identifies the purported speaker of the statement: the speakers here are "V1" and "V2," with V1 representing an unnamed "Law Enforcement" officer and "V2" representing Mr. Salas. *Id.* The third column purports to be a transcription of the statement in the language in which the statement was originally made. And the fourth column purports to be a translation of that statement into English, if the statement was originally made in

---

[2]  Certain rows in the exhibit display a single sentence fragment, while others contain a series of sentences. As a shorthand and for simplicity's sake, we refer to the content contained in each row of the transcript—whether it is a sentence fragment or a full-blown monologue of sorts—as a "statement." We follow a like approach with respect to Exhibits 16 and 17.

Spanish.  Below is an example of one of the rows in the table capturing one of the purported statements:

| 6. | V2 | [Unintelligible] Sí, wey. Da la vuelta wey, da la vuelta. Ya me hablas, ahorita te hablo. | [Unintelligible] Yes, dude. Turn around, dude. Turn around. Call me. I'll call you. |
|---|---|---|---|

*Id.* at 2 (Statement 6).

Exhibit 15 features a total of eight such statements.  The first row in the table consists of a statement by an unnamed law-enforcement officer introducing the recording.  The officer describes it as the "recording of a control[led] purchase of methamphetamine from Karin [sic] Miranda" on "July 22, 2016." *Id.* at 1 (Statement 1).  The remaining seven statements correspond to the substance of the recording, which purports to reflect Mr. Salas's side of his conversations with one or more unidentified person(s).  According to the transcript, Mr. Salas first tells his interlocutor(s) in Spanish that he is en route, then that he has arrived and is near Office Depot, and finally that he will go to "Chicago" instead. *Id.* (Statements 2, 4).  He then says the following in English: ". . . the white car . . . approaching." *Id.* at 2 (Statement 5) (omissions in original).  The transcript picks up again when Mr. Salas says in English (presumably to the agents listening in), "I got the product, I'm leaving . . . leaving that white Suzuki." *Id.* (Statement 7)

11

(omission in original).  Mr. Salas lastly describes in English the route that he is taking as he drives toward the "office."  *Id.* (Statement 8).

Several features of Exhibit 15 merit comment.  First, it does not define or otherwise explain certain key, recurring words in the transcript—namely, the terms "[u]nintelligible" and "[n]oisy."  In eight instances, the transcript indicates that the voice on the recording is "[u]nintelligible."  *Id.* at 1–2 (Statements 2–4, 6, 8).  But whether each marking of "[u]nintelligible" replaces one word, a single sentence, an entire paragraph, or some other portion of the conversation is altogether unclear.  Furthermore, in four instances, the recording is dubbed "[n]oisy."  *Id.* (Statements 2–3, 5, 8).  But the transcript does not identify precisely what the noises were, or whether they affected the quality of the recording—and if so, to what extent.  Moreover, in one particular instance, the recording is characterized as "[u]nintelligible–noisy," but, again, the transcript provides no information as to what this term means.  *Id*. at 1 (Statement 2).

Finally, as is the case with the other two transcripts at issue here (discussed *infra*), this transcript is devoid of information regarding its authorship and other aspects of its creation.  The transcript contains no information addressing who prepared it, how much time elapsed between the statements in each row, what process its preparer used to create it, or how and why the statements were broken up in the manner in which they were, among other missing contextual details.

12

**2**

Exhibit 16 is a transcript that purportedly reflects the contents of an audio recording from the August 3 controlled drug buy. *See id.*, Ex. 16 at 1 (entitling exhibit, "Translation of 8-3-2016 Recorded Purchase"). Like the transcript constituting Exhibit 15, the Exhibit 16 transcript is formatted as a table with rows of information pertaining to each statement allegedly made on the recording. The first column contains numbers in ascending order that enumerate each statement.[3] The second column identifies the voice making the statement: rows marked "B" denote Mr. Salas as the purported speaker, rows marked "R" denote Mr. Chavez as the purported speaker, and rows marked "C" denote Mr. Dominguez as the purported speaker. *Id.* The third column reproduces what was purportedly said on the recording, most of which is in Spanish. And the fourth column purports to be an English translation of the text in column three. The row for Statement 30, by way of example, is as follows:

---

[3] Directly beneath the numbers listing each statement are various number ranges, denoting what might be time stamps, signifying the time that elapsed on the recording between the start and end of each statement. But we are unable to say definitively that these number ranges represent time stamps because neither the transcript itself, nor the testimony or other record materials pertaining to this exhibit, provide any clarity to this effect. In any event, what these number ranges represent is not material: that is to say, our disposition is unaffected by them. In offering a description of the exhibit, we simply make note of this feature that is unique to Exhibit 16.

13

| | | | |
|---|---|---|---|
| 30.<br>00:39:38,<br>615 --><br>00:39:48,<br>760 | R | Ve "cabrón...<br>[ininteligible] Sí<br>vale! | why's it like that...<br>[unintelligible] It's<br>worth it |

*Id.* at 5 (Statement 30).[4]

There are fifty-four such statements in Exhibit 16. Of these, eight are marked as being completely "unintelligible." *Id.* at 1–3, 5, 8, 11 (Statements 2, 8, 14, 16, 26, 28, 41, 53). The remaining statements supposedly reflect Mr. Salas's side of several seriatim phone calls that took place just before the August 3 controlled drug purchase, as well as a purported recording of the controlled purchase itself involving Mr. Salas, Mr. Chavez, and Mr. Dominguez.

The first approximately dozen statements with an identifiable speaker are attributed to Mr. Salas, and those statements appear to reflect his side of several phone calls with another person about the meeting at Walmart. *See id.* at 1–4 (Statements 1, 3–7, 9–13, 15, 17–18). The remaining statements purportedly reflect the conversation that took place in the white car among Mr. Salas, Mr. Chavez, and Mr. Dominguez. *See id.* at 4–11 (Statements 19–54). According to the transcript, Mr. Chavez tells Mr. Salas that he does not have everything that

---

[4] We presume that the term "ininteligible" that appears in this row—as well as in various other parts of the transcript containing text in Spanish—is the Spanish-language equivalent of the English word "unintelligible." *See, e.g.*, Aplt.'s Opening Br. at 14–15 (pointing out examples in Exhibit 16 where "the source recording" is "unintelligible").

14

Mr. Salas requested. *See id.* at 4 (Statement 19, 21, 23) (indicating Mr. Chavez said that there was "a problem" because "[s]omebody from here screwed us" and "gave us 'base' with half"). They engage in a back and forth on this issue, with the transcript attributing the bulk of the statements to Mr. Chavez.

Toward the end of this discussion, Mr. Chavez purportedly says, *inter alia*, "you did a really good job, you're making some deals happen," and, "[i]f you keep being smart and if the more we get rid of and the more we can give you, we will give you more. I can get pills." *Id.* at 8 (Statements 43–44). The transcript also attributes to Mr. Chavez the statement, "I'm like the boss. I'm your boss. I can get you anything you want." *Id.* at 10 (Statement 51). No one in the conversation expressly mentions methamphetamine. The transcript shows that the speakers conversed predominantly in Spanish, albeit with an occasional phrase or sentence in English.

As was the case with Exhibit 15, certain aspects of Exhibit 16 merit comment. In particular, in certain instances, the Spanish transcription in column three and English translation in column four reflect what appear to be discrepant accounts of what was said on the recording. Take, for example, Statement 51:

| 51.<br>00:44:38,<br>610 --><br>00:44:46,<br>460 | R | Ponte las pinches pilas [ininteligible]... | I'm like the boss. I'm your boss. I can get you anything you want. I got everything for the next load. It's for us. Keep doing a good job and instead of Mckleen I'll be hooking you up. |
| --- | --- | --- | --- |

15

*Id.* Column three contains four words in Spanish, along with an "unintelligible" word or phrase. Meanwhile, column four contains thirty-eight words in English—over nine times as many words as the Spanish-language original in column three. It is unclear how four words in Spanish plus an "unintelligible" word or phrase translate into thirty-eight intelligible words in English.

Exhibit 16 embodies another kind of discrepancy between columns three and four: the English words that respectively appear in the two columns do not match up. Although witness testimony and the transcript itself suggest that most of the statements captured on the recording were originally spoken in Spanish, in a handful of instances, the speakers spoke in English. In such instances, column three (i.e., the column capturing the statements as they were originally made) and column four (i.e., the column reflecting the English translation of those statements) both contain statements in English. And it would stand to reason that the English statements in the two columns should be identical to one another. The transcript, however, proves otherwise, as Statement 46 exemplifies:

| 46. 00:43:37, 840 --> 00:43:42, 460 | R | Así que quédate callado and you keep on doing this shit we gave you more money because we fucked up. | So stay silent. Keep doing what we're doing and that will be more money for you.   [ |

16

*Id.* at 9 (Statement 46).[5]  Column three includes, *inter alia*, the following language attributed to Mr. Chavez: "you keep on doing this shit we gave you more money because we fucked up."  *Id.*  Column four, on the other hand, shows Mr. Chavez allegedly stating, in relevant part, "[k]eep doing what we're doing and that will be more money for you."  *Id.*  Query which of these two accounts represents what was actually said by the voice identified as Mr. Chavez's.  Did he say, "you keep on doing this shit," or did he say, "[k]eep doing what we're doing"?  And in that same vein, did he say, "we gave you more money because we fucked up," or did he say, "and that will be more money for you"?  The transcript leaves these questions unanswered.  Such discrepancies pervade Exhibit 16.

**3**

Finally, Exhibit 17 purports to be a transcript of a phone call between Mr. Chavez and Mr. Salas on August 3 before they arrived at the Walmart parking lot where they allegedly engaged in a drug transaction that day.  *See id.*, Ex. 17 at 1 (entitling exhibit, "Translated Recorded Call on 8-3-2016").  Like Exhibits 15 and 16, Exhibit 17 is formatted in the style of a table containing rows for each statement allegedly made on the recording.  The first column enumerates each statement by number, in ascending order, and the second column identifies the

---

[5]       The single bracket (i.e., "[") in the fourth column for Statement 46 is apparently a typographical error.

17

speaker, with "V1" and "V2" corresponding, respectively, to what are purportedly Mr. Chavez's and Mr. Salas's voices on the recording. *Id.* A third voice ("V3") is unidentified. *Id.* A fourth voice, which is identified only as "Officer," introduces the recording as a call "in reference to arranging the purchase of approximately 4 ounces of methamphetamine." *Id.* (Statement 1). Column three purportedly reproduces what was said on the recording in its original language. And the fourth column purports to be an English-language translation of the text in column three. An illustrative example is the entry for Statement 10:

| 10. | V1 | (Talking to a third person) ¿Cuánto nos falta? | (Talking to a third person) How much are we missing? |

*Id.* (Statement 10).

Exhibit 17 features thirty-six such statements. Of those statements, sixteen are attributed to Mr. Chavez. *Id.* at 1–2 (Statements 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26–27, 29, 31, 33). Thirteen statements are attributed to Mr. Salas. *See id.* (Statements 5, 7, 9, 13, 15, 17, 19, 21, 23, 25, 28, 30, 32). Only an "[u]nintelligible" statement is attributed to the unidentified third participant in the conversation, "V3." *Id.* at 1 (Statement 11). And four statements are attributed to the unidentified "Officer." *Id.* at 1–3 (Statements 1, 3, 34–35). A majority of the statements—as reflected in column three of the transcript—are entirely or partially in Spanish.

18

As for the substance of the transcript, the officer's introductory statement indicates that it is of "a recorded call to Randy . . . . in reference to arranging the purchase of approximately 4 ounces of methamphetamine." *Id.* at 1 (Statement 1). The transcript then purports to record an oral exchange between Mr. Chavez and Mr. Salas, wherein they discuss meeting and the price "for the four," although what "the four" refers to is not made clear. *Id.* at 2 (Statement 17).

## C

At trial, the three above-described transcripts were introduced by the government as Exhibits 15, 16, and 17, and various parts of the transcripts were read into the record. This process of securing admission of the exhibits began with the government calling Trooper Joseph Scimone "to testify as to the veracity of the translations" in the transcripts. *Id.*, Vol. III, at 175. Working through the exhibits in seriatim fashion, the government asked Trooper Scimone in front of the jury whether he had reviewed each of them and whether, based on his training and experience, they constituted accurate translations of their respective recordings. As to all three exhibits, Trooper Scimone answered in the affirmative. At no point did the government ask whether he had prepared the transcripts himself, nor did he indicate that this was the case. Indeed, at no point

19

during trial did the government disclose (through witness testimony or otherwise) the identity of the preparer of the transcripts.[6]

After concluding its examination of Trooper Scimone and while the jury was in recess, the government moved the district court to find that Trooper Scimone had offered (presumably sufficient) proof that the transcripts constituted "accurate translations of the controlled purchases and the recorded phone calls." *Id.* at 94–95. Mr. Chavez said that he had "no objection" to the accuracy of the translations, but he objected on the ground that "[t]here has yet to be foundation and things of that sort." *Id.* at 95. The district court did not rule on Mr. Chavez's objection.

Later in the proceedings, in the presence of the jury, the government called Mr. Salas and Special Agent Ruby to authenticate the exhibits. Starting with Exhibit 16, the government asked Mr. Salas whether he had previously reviewed the transcript while listening to the concomitant audio recording; Mr. Salas

---

[6]     At oral argument, the government confirmed that Trooper Scimone did not prepare the transcripts and acknowledged that the record did not identify who did. Oral Arg. at 24:00–24:17. It then went on to note, without elaboration, that "interpreters" at a "firm" had prepared the transcripts' Spanish-to-English translations but that it proved too logistically difficult to call those interpreters to testify at trial. *Id.* at 24:17–24:35. Accordingly, the government explained, it called Trooper Scimone—who, according to the government's representations, had previously conducted an "interpretation" for the government—to review the recordings, make "a couple" of corrections to the transcripts, and testify at trial to their accuracy. *Id.* at 24:35–25:17.

20

testified that he had. *Id.* at 153. He further attested that based on his review of the recording, the voice labeled "B" on the transcript was his own voice, and that the voice labeled "R" on the transcript was Mr. Chavez's. *Id.* at 153–54. Then, the government elicited similar testimony from Mr. Salas as to Exhibit 17, with Mr. Salas again testifying that he had reviewed the transcript and the recording and that the transcript "accurately reflect[s] the voices [he] heard in" the recording. *Id.* at 155. Specifically, he confirmed that the voices on the recording corresponding to the letters "R" and "B" on the transcript were Mr. Chavez's voice and his own voice, respectively.

Following his cross-examination of Mr. Salas, in the jury's presence, Mr. Chavez lodged the following objection: "I realize[] that there ha[ve] been at least three exhibits talked about -- transcription and interpretation of a document; this witness also testified that according to him, it is what he heard, saw and this is an accurate translation. I think that offends the Best Evidence Rule." *Id.* at 171. Accordingly, he requested that if the government was "going to introduce conversations [from] during the buys, that the actual audio be played and interpreted for the jury." *Id.* Shortly thereafter, during a brief jury recess, Mr. Chavez reiterated his objection as follows:

I think the Best Evidence Rule applies. We are talking about Rule 1002 and those transcripts -- those audio transcripts [sic][7] are available. I just got a copy a little while ago. If this individual -- we are talking about the person that just testified [i.e., Mr. Salas], he is the one that says, "Well, you know, this is what I am hearing and this is what it was," he is not the one who produced those written transcripts. That was another person. I think it was Trooper Scimone. I don't think they worked in concert when they did that, and so it seems to me that due process would call that the defendant should be allowed to have the jury listen to the transcripts [sic]; let them actually hear what is being said, even though it may be in Spanish, then we have -- the State can always have it interpreted as they go piece by piece as to what is being said, or the defendant -- I'm sorry -- the witness that just testified.

*Id.* at 174–75. The government rejoined that the transcripts were admissible because Trooper Scimone had testified about his Spanish expertise and attested to the accuracy of the translations, and Mr. Salas had authenticated the identity of the speakers and was present at the original conversations.

The district court, still outside of the jury's presence, overruled Mr. Chavez's objection and admitted Exhibits 16 and 17 into evidence without playing or admitting their underlying audio recordings. The court reasoned that the

---

[7]     During oral argument, the government represented that it had provided the audio recordings of the two controlled purchases to Mr. Chavez and had done so "well in advance of trial." Oral Arg. at 20:45–20:48, 21:25–21:26. Given the context of his objection and his reference to the best-evidence rule and specifically Federal Rule of Evidence 1002, we believe that, in the quoted passage, when Mr. Chavez mentioned "audio transcripts" and subsequently urged "hav[ing] the jury listen to the transcripts," he actually was referring to the audio recordings.

government had laid a sufficient foundation and that there was no dispute that the transcripts accurately represented the contents of the audio recordings, such that it could properly "receive those documents, and they, in fact, reflect and are the evidence in this case." *Id.* at 176. In so ruling, the district court went on to note as follows:

> Usually, a transcript is not evidence in and of itself, but the tape would be the evidence. To the extent that a transcript would differ in the minds of the jury from the transcript [sic], the jury would consider what they heard when the tape was played for them in the English language. This is not so with Spanish conversations that have been introduced.
>
> The translated transcripts are the evidence you should rely on, and the jury is not free to reject the translation contained in the transcripts of the tape recordings given in this case and agreed to be as accurate translations.

*Id.* at 176–77.

Later on in the trial proceedings before the jury, the government examined Special Agent Ruby in connection with authenticating Exhibit 15. Special Agent Ruby confirmed that he had reviewed the Exhibit 15 transcript and listened to the corresponding audio recording. He further attested that, based on his familiarity with Mr. Salas's voice from multiple conversations with him, he recognized the primary voice on the recording as Mr. Salas's. The government then moved to admit Exhibit 15 into evidence. In response, Mr. Chavez objected, "Best evidence rule. [Special Agent Ruby] didn't produce this document. Half of it is

23

in Spanish. I don't think he is qualified in any way, shape or form to speak or understand Spanish." *Id.* at 230. The government seemed to concede that Special Agent Ruby was not qualified to understand Spanish. *See id.* But, the government explained, Special Agent Ruby was authenticating the transcript instead by attesting to his recognition of Mr. Salas's voice on the recording (and not by verifying the translation's accuracy). Without explanation, the district court overruled Mr. Chavez's objection and admitted Exhibit 15 into evidence.

Having at that point moved all three exhibits into evidence, the government turned its attention to asking Special Agent Ruby questions about Exhibit 17. Preliminarily, during a sidebar, the government noted its intention to read certain parts of the exhibit's transcribed phone call to the jury. In response, Mr. Chavez asserted that his "objection still stands that [the call's conversation was] in Spanish." *Id.* at 241. The government advised the district court that it would "just read the English." *Id.* Overruling Mr. Chavez's "continuing objection," the court concluded the sidebar by explaining, "I just don't see how you would require the jurors to become experts in the Spanish language." *Id.* Resuming its examination in front of the jury, the government arranged for selected portions of the transcript to be read into the record, with Special Agent Ruby reading aloud

the statements in the transcript attributed to "V1" and counsel for the government

reading aloud the statements attributed to "V2."[8]

The government subsequently took up Exhibit 16 in similar fashion. *See id.*

at 259–61. At the beginning of his cross-examination of Special Agent Ruby, Mr.

Chavez mounted an objection to the government's direct examination, arguing in

front of the jury that the government "should be required to comply with the Best

Evidence Rule" and noting that he was "particularly concerned about Exhibit 16."

*Id.* at 266. He pointed out, by way of example, that the transcript for Statement

34 "has a few lines in Spanish" in the third column, but then it "has a long

paragraph in English" in the fourth (i.e., English-translation) column. *Id.* at

266–67. He then rhetorically asked, "[W]here are they getting this information?

It is not . . . a direct translation from the Spanish to the English." *Id.* at 267. In

light of such issues, Mr. Chavez posited, "I think due process requires that the

defendant be allowed -- to allow the jury to actually hear that Spanish and have

the State provide a line by line translation about who is saying what, when." *Id.*

When asked by the district court whether he was changing his position after

agreeing earlier in the proceedings that the transcript contained "an accurate

translation," Mr. Chavez responded as follows: "[T]hat's been one of my

---

[8] Recall that during his examination, Mr. Salas indicated that, based on his review of the audio recording, "V1" and "V2" reflected the voices of Mr. Chavez and himself, respectively.

concerns, but my first -- Best Evidence Rule objection was pretty much the same thing. I think the best evidence would be the actual audio recording being played to the jury, and then interpreted line by line to the jury as it is being played." *Id.* The district court overruled this objection.

Later in the proceedings, after the government rested and before the jury began deliberating, the district court provided final instructions to the jury. As relevant here, the court issued Instruction 26, which read, in relevant part, as follows:

> The United States has introduced Spanish language transcripts . . . . While in a case involving English recorded conversations and transcripts, the jury is routinely instructed that they are not bound by the transcript, that is because every juror is just as capable as the person preparing the transcript to tell what is being said on the recording. This is not so with Spanish conversations . . . . *The translated transcripts are the evidence you should rely on.* You are not free to reject the translation contained in the transcripts of the tape recordings . . . . You are, however, free to give this evidence whatever weight or consideration you deem to be justified . . . .

*Id.*, Vol. I, at 112 (Jury Instr. No. 26, dated Oct. 5, 2017) (emphasis added). Mr. Chavez did not object to this instruction. *See* Aplt.'s Opening Br. at 35.

The jury convicted Mr. Chavez of both counts of distributing methamphetamine. For each count, the district court sentenced him to ninety-five months of imprisonment followed by five years of supervised release, to be served concurrently. R., Vol. I, at 152–53 (Am. J., entered Dec. 18, 2017).

## II

On appeal, Mr. Chavez advances two main challenges to his convictions. First, he argues that the district court's admission of the transcripts of the recordings, without admitting the recordings themselves, violated the "best evidence rule" under Federal Rule of Evidence 1002. Aplt.'s Opening Br. at 19. This rule, Mr. Chavez maintains, "required the government to admit the actual audio recordings," with the transcripts serving "only as an aid in understanding the audio recordings"—and not, as the district court ruled, as the exclusive evidence of the conversations captured on those recordings. *Id.*; *see also id.* at 20–34. Second, Mr. Chavez challenges as plain error the district court's instruction to the jury that it was required to accept as accurate the translations contained in the transcripts of the recordings; in his view, the jurors "should have been instructed that they were free to reject the accuracy" of those translations. *Id.* at 19–20; *see also id.* at 35–42.

The government disagrees on both scores. With respect to Mr. Chavez's best-evidence-rule challenge, the government rejoins that "[a]n audio recording of a transaction entirely conducted in a language that jurors do not understand is not the best evidence." Aplee.'s Resp. Br. at 7; *see also id.* at 8–14. The government contends that once "[t]he proper foundation for the translation[s] and transcription[s] was provided," "those properly authenticated transcripts *were* the

27

'best evidence' of the transactions or conversations to which they related." *Id.* at 7. As to Mr. Chavez's jury-instruction challenge, the government argues that the district court did not commit plain error because the instruction "was a correct statement of the relevant law" that "properly informed the jurors to give the transcripts the weight they deemed appropriate." *Id.* at 8; *see also id.* at 14–22.

For reasons set forth below, we agree with Mr. Chavez that the district court violated the best-evidence rule by admitting the transcripts of the audio recordings without admitting the recordings themselves. In so doing, the district court committed reversible error, and we thus reverse and remand the case to the district court with instructions to vacate Mr. Chavez's convictions and grant him a new trial. As noted, because we are able to resolve this appeal on the basis of Mr. Chavez's best-evidence-rule challenge, we have no need to reach his jury-instruction challenge and, accordingly, decline to do so.

## A

A district court's evidentiary decisions are reviewed for abuse of discretion. *United States v. Iverson*, 818 F.3d 1015, 1019 (10th Cir. 2016); *see also United States v. Phillips*, 543 F.3d 1197, 1203–04 (10th Cir. 2008) (reviewing appellants' challenge to district court's admission of evidence, brought pursuant to best-evidence rule, for abuse of discretion). "Because evidentiary rulings are within the sound discretion of the district court, this court will reverse only upon a

'definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (quoting *Gilbert v. Cosco, Inc.*, 989 F.2d 399, 402 (10th Cir. 1993)). Notably, "[a] district court abuses its discretion if its decision is based upon an error of law." *United States v. Tan*, 254 F.3d 1204, 1207 (10th Cir. 2001) (quoting *United States v. Cherry*, 217 F.3d 811, 814 (10th Cir. 2000)).

**B**

**1**

The best-evidence rule, embodied in Federal Rule of Evidence 1002, codifies a doctrine with a "long and venerable history" rooted in English common law. 5 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 10:17, Westlaw (database updated May 2020). Dating back to the 1700s, this foundational doctrine requires a party seeking to prove the contents of any writing, recording, or photograph to produce the originals.[9] *See Seiler v.*

---

[9] The phrase "best-evidence rule" is something of a misnomer, as the rule does not demand that litigants furnish only the evidence that is categorically the "best" in a qualitative sense of that term. *See, e.g.*, *Best*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (defining "best" as, *inter alia*, "excelling or surpassing all others of its kind in inherent quality"). Rather, the "origins and subsequent history of the doctrine make clear that it was always narrowly applied to regulate just evidence of the contents of writings" and, in later times, recordings, requiring that the contents of an available writing or

(continued...)

29

*Lucasfilm, Ltd.*, 808 F.2d 1316, 1318 (9th Cir. 1986); 2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE §§ 230–31, Westlaw (database updated Jan. 2020). Stated differently, under this rule, evidence offered to prove the contents of an original writing, recording, or photograph is *not* admissible, unless the original itself is *also* admitted. *See* 2 BROUN ET AL., *supra*, § 231.

The animating purpose of this rule is to "promote accurate fact-finding." 31 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 7162, Westlaw (database updated Apr. 2020). And the rule fulfills this role in three main ways. First, it alleviates "[t]he danger of mistransmission of critical facts through the use of written copies or recollection." 2 BROUN ET AL., *supra*, § 232. In other words, it minimizes the risk of human error that inheres from the production of so-called "secondary" evidence—that is, evidence other than the original offered to prove all or part of the original's contents; the original, of course, constitutes "primary evidence" of its own contents. *United States v.*

---

[9](...continued)
recording be proved by introducing into evidence the original itself. 31 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 7181, Westlaw (database updated Apr. 2020); *see* FED. R. EVID. 1002 advisory committee's note to 1972 Proposed Rules (noting that "[t]he rule is the familiar one requiring production of the original of a document to prove its contents" and that "[a]pplication of the rule requires a resolution of the question *whether contents are sought to be proved*" (emphasis added)). Thus, the best-evidence rule might be more aptly called "the 'original document rule.'" 3 BARBARA E. BERGMAN ET AL., WHARTON'S CRIMINAL EVIDENCE § 15:1, Westlaw (database updated Nov. 2019).

*Nunez*, 532 F.3d 645, 651 (7th Cir. 2008) (using the term "primary evidence" to describe an audio recording and to contrast it with a transcript of the recording); *see United States v. Alexander*, 326 F.2d 736, 742 (4th Cir. 1964) ("As between a supposed literal copy and the original, the copy is always liable to errors on the part of the copyist, whether by wilfulness or by inadvertence"—a problem that "wholly disappears when the original is produced." (quoting 4 JOHN HENRY WIGMORE, EVIDENCE § 1179 (3d ed. 1940))); 2 BROUN ET AL., *supra*, § 232 & n.4 ("The burden on litigants of requiring them to introduce the writing if available is outweighed by the increased accuracy of the factfinding process." (quoting CHRISTOPHER B. MUELLER ET AL., EVIDENCE § 10.1 (6th ed. 2018))).

Second, the best-evidence rule guards against fraud. In the absence of the original of a given source, witnesses may be tempted to "lie with impunity about the original's contents because the risk of detection is small"—a temptation that the best-evidence rule removes by requiring the originals to be produced. 31 WRIGHT ET AL., *supra*, § 7182; *see United States v. Howard*, 953 F.2d 610, 613 (11th Cir. 1992) (per curiam) ("The best evidence rule presupposes the existence at one time of a decipherable original, and is intended to prevent fraud in proving the contents of documents and/or recordings."). Finally, even when there is no human error or outright fraud, secondary evidence "may leave out crucial details

31

the omission of which may be difficult to discern"; that is, it raises the risk of "incomplete[ness]."  31 WRIGHT ET AL., *supra*, § 7182.

Enter the best-evidence rule, which implements the "elementary wisdom" that an original is "a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description."  *Gordon v. United States*, 344 U.S. 414, 421 (1953); *Seiler*, 808 F.2d at 1319 ("[T]he hazards of inaccurate or incomplete duplication are [among] the concerns addressed by the best evidence rule.").

Congress codified this common-law wisdom in the Federal Rules of Evidence, specifically in Rule 1002.  5 MUELLER & KIRKPATRICK, *supra*, § 10:17 ("Rule 1002 represents the 'teeth' of the Best Evidence doctrine.").  In doing so, Congress left it to the courts to read and apply Rule 1002's terms according to "their plain meaning."  *Warger v. Shauers*, 574 U.S. 40, 44 (2014) (explaining that in construing a disputed Federal Rule of Evidence, the Court would "simply accord [the rule's] terms their plain meaning").  And here, Rule 1002's meaning is plain as day: it demands that courts exclude secondary evidence of an original's contents unless the original is in evidence.  That bar is absolute, other than where "[the Federal Rules of Evidence] or a federal statute provides otherwise."  FED. R. EVID. 1002.  Consistent with this command, Congress has approved of specific exceptions to the best-evidence rule, *see* FED. R. EVID. 1003–07—but an

32

exception for foreign-language recordings is not among them.  *Cf.* Antonin Scalia

& Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93

(2012) ("[A] matter not covered is to be treated as not covered.").  Put simply,

under the plain meaning of Rule 1002, the best-evidence rule does *not* permit

courts to admit English-translation transcripts of foreign-language recordings

when the recordings themselves are not also in evidence.

**2**

Our circuit's unbroken practice comports with the best-evidence rule's

plain meaning.  For over forty years, in cases in which we have affirmed the use

of a transcript of a recording at trial, we have done so only where the recording

itself was admitted.  That is to say, we have consistently and unreservedly said

that a party seeking to introduce a transcript must furnish that transcript *in*

*addition to*—not in lieu of—the underlying recording.[10]  And even then, we have

---

[10]     *See, e.g.*, *United States v. Hooks*, 551 F.3d 1205, 1215–16 (10th Cir. 2009) (holding that the district court did not plainly err in allowing jury to use transcripts *as an aid* in listening to a recording without a limiting instruction); *United States v. Davis*, 929 F.2d 554, 559 (10th Cir. 1991) (holding that the district court did not abuse its discretion in admitting transcripts with "a proper cautionary instruction . . . that the tapes were the true evidence and that the transcripts were to be used only for clarification"); *United States v. Mayes*, 917 F.2d 457, 463 (10th Cir. 1990) (same); *United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir. 1987) (holding that the district court did not abuse its discretion in allowing the jury to view transcripts of tape recordings in evidence in part because it instructed the jury "to disregard the transcript if particular words were indeterminable from the tapes"); *United States v. Mittleider*, 835 F.2d 769, 773
(continued...)

33

indicated that the transcript must serve merely "*to assist* the trier of fact" in listening to the recording—as opposed to replacing the recording entirely. *See United States v. Devous*, 764 F.2d 1349, 1354 (10th Cir. 1985) (emphasis added); *see, e.g.*, *United States v. Hooks*, 551 F.3d 1205, 1215–16 (10th Cir. 2009) (holding that the district court did not plainly err in allowing jury to use transcripts *as an aid* in listening to a recording without a limiting instruction); *United States v. Mittleider*, 835 F.2d 769, 773 (10th Cir. 1987) ("[T]he court [did not] err in allowing the jury to view the written transcripts of the tapes. The transcripts were not admitted into evidence. The court preliminarily instructed the jury that the transcripts were not evidence and had been furnished solely for the purpose of guidance."), *abrogated on other grounds by Staples v. United States*, 511 U.S. 600 (1994).

---

[10](...continued)
(10th Cir. 1987) (holding that the district court did not abuse its discretion in permitting the jury to view transcripts of tape recordings in evidence "for the purpose of guidance"), *abrogated on other grounds by Staples v. United States*, 511 U.S. 600 (1994); *United States v. Devous*, 764 F.2d 1349, 1354–55 (10th Cir. 1985) (holding that the district court did not abuse its discretion in admitting transcripts of "tapes of marginal quality" in evidence "to assist the trier of fact"); *United States v. Lucero*, 601 F.2d 1147, 1149–50 (10th Cir. 1979) (holding that the district court did not reversibly err in allowing jury to use transcripts as aids in listening to tapes in evidence); *United States v. Watson*, 594 F.2d 1330, 1336 (10th Cir. 1979) (holding that the district court did not abuse its discretion in permitting the jury "to use the transcripts only to assist them in listening to the tapes" in evidence and instructing them "not to consider the transcripts as evidence").

More pointedly, we have followed this practice in cases involving foreign-language recordings. Specifically, we have allowed English-translation transcripts of foreign-language recordings only as aids in understanding the *admitted* recordings themselves (i.e., the primary evidence). In other words, under our practice, the English-translation transcript is permitted for use only in conjunction with the foreign-language audio recording: it is the recording itself—not the transcript of the recording—that constitutes the primary evidence. *See, e.g.*, *United States v. Verdin-Garcia*, 516 F.3d 884, 892 (10th Cir. 2008) ("Appellants argue next that the district court should have held a *Daubert* hearing on the admission of translations of intercepted [Spanish-language] phone calls, and should have excluded them. . . . The recordings themselves were admitted as substantive evidence; the translations were shown to the jury for demonstrative purposes only."); *United States v. Gomez*, 67 F.3d 1515, 1526–27 (10th Cir. 1995) (same); *see also United States v. Rivera*, 778 F.2d 591, 600 (10th Cir. 1985) (holding that district court did not abuse its discretion in admitting foreign-language recordings with English-translation transcripts). Thus, the unmistakable practice of this circuit comports with the best-evidence rule, as understood at English common law and as embodied in Federal Rule of Evidence 1002.[11]

---

[11] Our pattern jury instructions, although not binding, provide telling confirmation of the state of our existing practice, in particular as that practice
<span style="float:right">(continued...)</span>

35

Our practice is also consistent with that of many of our sister circuits

regarding the admissibility of foreign-language recordings.  Time and again, these

courts have likewise established that English-translation transcripts may be

admitted only where the underlying foreign-language recordings are themselves in

evidence.  The First Circuit, for instance, has unambiguously held that insofar as

English-translation transcripts of foreign-language recordings are at issue, "[t]he

best evidence rule requires that the [foreign-language] recordings themselves

must be furnished." *United States v. Morales-Madera*, 352 F.3d 1, 9 (1st Cir.

2003).  The Second Circuit views the matter similarly.  For example, in *United*

---

[11](...continued)
pertains to foreign-language recordings.  Those instructions persuasively confirm
the clear import of our caselaw (as just surveyed *supra*): *viz.*, to the extent that a
party makes use of a transcript of a recording at trial, the recording itself *must* be
in evidence.  Indeed, under our pattern jury instructions, jurors are to be
instructed that "transcripts are not evidence" and that rather "[t]he recordings
themselves are the evidence."  10TH CIR. PATTERN JURY INSTR. § 1.40 (2018); *see
also id.* (citing *Gomez*, 67 F.3d at 1527 n.15, a case involving recordings of
partially Spanish-language conversations, for the proposition that "a cautionary
instruction that the transcripts are only an aid in understanding the sound
recording is preferred").  Stated otherwise, our pattern jury instructions counsel,
consistent with the practice uniformly reflected in our caselaw, that it is the
underlying recordings themselves—not the transcripts that purportedly reflect the
recordings' contents—that constitute the best evidence of their contents.  And,
therefore, where a litigant seeks to introduce proof of a recording's contents, the
litigant must admit the recording itself; this is a necessary condition for seeking
to aid the jury's understanding of the recording's contents through the admission
of a transcript of the recording.

*States v. Ben-Shimon*, 249 F.3d 98 (2d Cir. 2001) (per curiam), that court stated that when "the recorded conversation is conducted in a foreign language, an English language transcript *may be* submitted to permit the jury to understand and evaluate *the evidence* [i.e., *the recording*]," *id.* at 101 (emphases added)—with the clear implication being that *the recording* constitutes the best evidence and, insofar as the concomitant transcript was furnished to the jury, the recording itself must be admitted.

The Seventh Circuit has articulated largely the same understanding of the role of foreign-language recordings in trial proceedings: "[t]he jury should be instructed that it is the tape recording itself which is the primary evidence, [and] that the transcript is to assist the jury in evaluating the primary evidence . . . ." *Nunez*, 532 F.3d at 651; *see id.* (holding that where English-translation transcripts had been prepared of recorded Spanish-language conversations purportedly reflecting defendant's participation in methamphetamine transactions, the district court erred in instructing the jury "that it could afford as much weight as it felt proper to the transcripts of the intercepted conversations" because "transcripts should not ordinarily be given independent weight").  Likewise, the Third Circuit has upheld the use of English-translation transcripts to perform the "limited role" of aiding the jury in understanding foreign-language audio recordings, which were themselves admitted into evidence.  *Gov't of V.I. v. Martinez*, 847 F.2d 125, 128

(3d Cir. 1988). So, too, the Eighth Circuit. *See, e.g.*, *United States v. Martinez*, 951 F.2d 887, 888 & n.2 (8th Cir. 1991) (rejecting defendant's challenge to the jury's use of transcripts where "the prosecution introduced three taped conversations [some of which were in Spanish] between [defendant] and a police informant recorded while the informant purchased cocaine from [defendant]" and where English-translation "[t]ranscripts of the tapes were given to the jurors with which to follow along while the tapes were played").

The Eleventh Circuit, moreover, has affirmed the admission of English-translation transcripts for the purpose of assisting the jury in understanding *admitted* foreign-language recordings. *See, e.g.*, *United States v. Garcia*, 854 F.2d 1280, 1283 (11th Cir. 1988) (noting, in a case involving Spanish-language recordings, that "[o]ur case law provides district courts with the authority to allow juries to read properly authenticated transcripts while *listening to taped conversations*" and that the district court did not abuse its discretion in allowing "the admission of the transcript . . . as an aid to the jurors" (emphasis added)).

The Ninth Circuit, for its part, has in certain cases affirmed the admission of English-translation transcripts as substantive evidence—as opposed to merely for assistive purposes (i.e., as jury aids); however, that court has not allowed a trial court to admit such transcripts if the trial court has not *also* admitted into evidence the foreign-language recordings themselves. *Compare, e.g.*, *United*

38

*States v. Abonce-Barrera*, 257 F.3d 959, 962, 964 (9th Cir. 2001) (discerning no

abuse of discretion by the trial court where "the Spanish-language tapes were

played for the jury, and the English translations were read to the jury"), *with*

*United States v. Franco*, 136 F.3d 622, 625–28 (9th Cir. 1998) (approving of the

trial court's admission of English-translation transcripts as substantive evidence,

*along with* the Spanish-language recordings).  And more generally, other courts

have expressly held that "the [trial] court must ensure that the transcript is used

only in conjunction with the tape recording."  *United States v. Holton*, 116 F.3d

1536, 1543 (D.C. Cir. 1997).

As this survey reveals, many of our sister circuits, in analyzing the

admissibility of foreign-language recordings, are guided by the following

touchstone principle: English-translation transcripts may be admitted only *in*

*addition* to the underlying foreign-language recordings, not in lieu of them.[12]  In

---

[12]     To be sure, the caselaw across—and even within—the foregoing
circuits diverges on whether English-translation transcripts are to be admitted
only for assistive purposes or as substantive evidence regarding the contents of
the foreign-language recordings.  But that distinction does not alter the
unmistakable message that these cases uniformly convey: English-translation
transcripts may be admitted only *in addition* to the foreign-language recordings,
not in lieu of them.  Whatever the evidentiary status of the transcripts, there is no
question that the audio recordings must be admitted—as the primary evidence of
the content of the foreign-language conversations.

other words, there is no question in these circuits that the audio recordings *must be admitted* as evidence of the content of the foreign-language conversations.[13]

---

[13] Our research has unearthed several decisions of our sister circuits that appear to hold to the contrary. *See, e.g.*, *United States v. Estrada*, 256 F.3d 466, 473 (7th Cir. 2001) (noting that "the district court saw no value in allowing a presumably English speaking jury to hear tapes that were recorded in Spanish"); *United States v. Grajales-Montoya*, 117 F.3d 356, 367 (8th Cir. 1997) (finding no abuse of discretion where the trial court denied defendant's request to admit the tapes as well as the transcripts, on the view that the defendant "has suggested no reliable means of enabling people who do not speak Spanish to interpret inflections and tone, and we cannot think of any, either"); *United States v. Valencia*, 957 F.2d 1189, 1194 (5th Cir. 1992) (concluding that "an English translation transcript can be introduced into evidence without admitting or playing the underlying foreign language tape for the jury"), *abrogated on other grounds by Apprendi v. United States*, 530 U.S. 466 (2000). These cases do not give us pause. For one, these decisions espouse a view that, as clearly demonstrated *supra*, is distinctly in the minority among our sister circuits. Indeed, some of these decisions—like that of the Seventh Circuit panel in *Estrada*—appear to be outliers in their own circuits. *Compare, e.g.*, *Estrada*, 256 F.3d at 473, *with Nunez*, 532 F.3d at 651 (where Spanish-language recordings were admitted into evidence, stressing that "[t]he jury should be instructed that it is the tape recording itself which is the primary evidence, [and] that the transcript is to assist the jury in evaluating the primary evidence"), *and United States v. Magana*, 118 F.3d 1173, 1181, 1184 (7th Cir. 1997) (noting, where "tapes played were of conversations in either English, Spanish, or Assyrian," "that '[c]ourts possess wide discretion in determining whether to permit the jury to use written transcripts as aids in listening to tape recordings'" (alteration in original) (quoting *United States v. Zambrana*, 841 F.2d 1320, 1335 (7th Cir. 1988))), *and* 7TH CIR. PATTERN CRIM. JURY INSTR. 3.15 (2012 ed., last updated Apr. 2019) (providing in the Seventh Circuit pattern jury instructions the following: "During the trial, [list name of language] language recordings were admitted in evidence. You were also given English transcripts of those recordings . . . ."). Furthermore, these decisions are thin on analysis and, in some instances, their language regarding the lack of necessity for admitting the foreign-language recordings themselves amounts to no more than dicta. For example, insofar as the analysis in *Valencia*, *supra*, speaks to the actual exclusion of foreign-language recordings from

(continued...)

In sum, the best-evidence rule's plain meaning, centuries of common-law wisdom, over forty years of this court's unbroken practice, and the decisions aplenty of our sister circuits, counsel that transcripts of recordings—including English-translation transcripts of foreign-language recordings—are inadmissible unless the recordings, themselves, have been admitted.  As such, that approach drives our analysis here, to which we now proceed.

## C

Applying the foregoing principles, we hold that the district court violated the best-evidence rule and in so doing committed reversible error.  We explain our holding in two parts.  First, we assess whether the district court abused its discretion by admitting the transcripts of the recordings without admitting the recordings themselves in violation of the best-evidence rule.  We conclude that the district court did so err.[14]  Second, we assess whether this error was

[13](...continued)
evidence, it is dictum because the foreign-language recording there *was* admitted into evidence, even though it was not played for the jury.  *See* 957 F.2d at 1193.  In sum, these contrary decisions lack the power to persuade and, consequently, do not give us pause, let alone alter the substance of our analysis.

[14]    For clarity's sake, we pause to underscore the limited scope of our holding.  What we address here is the question of whether a district court—facing the same or similar circumstances involving at least partly foreign-language recordings and English-translation transcripts—would be obliged to admit into evidence the foreign-language recordings themselves under the best-evidence rule as the primary evidence of the contents of those recordings.  Mr. Chavez's core relief for his first claim hinges on the answer to that question.  *See, e.g.*, Aplt.'s

(continued...)

Opening Br. at 19 ("It was error for the district court to allow the government to admit the transcripts *instead of* the recordings."). And we answer it in the affirmative. What we do not address is how a district court, in circumstances such as these, may properly regulate the use of such foreign-language audio recordings once they are admitted into evidence. And it follows perforce that we do not hold that, in the same or similar circumstances, district courts must routinely play the foreign-language audio recordings in their entirety for the jury. The use-of-audio-recordings question is not before us because the district court here did not admit the recordings into evidence at all. And we recognize that the permissible uses to which parties may put such evidence, once admitted, is a matter that lies in the first instance within the sound discretion of the district court. *See* FED. R. EVID. 611(a)(1), (2) ("The court should exercise reasonable control over the mode and order of . . . presenting evidence so as to . . . make those procedures effective for determining the truth" and to "avoid wasting time . . . ."); *Silver v. Cormier*, 529 F.2d 161, 164 (10th Cir. 1976) ("The extent, by repetition or otherwise, of the admission of competent evidence is a matter peculiarly within the discretion of the trial judge and will not be disturbed by this court absent a clear abuse of such discretion."); *see also* FED. R. EVID. 403 (providing that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of," *inter alia*, "confusing the issues, . . . undue delay, wasting time, or needlessly presenting cumulative evidence"); FED. R. EVID. 611 advisory committee's note to 1972 Proposed Rules ("The ultimate responsibility for the effective working of the adversary system rests with the judge."); *cf. United States v. Lujan*, 603 F.3d 850, 859 (10th Cir. 2010) ("[T]he district court can use its discretion to ensure the jury receives the evidence that is highly probative . . . , while at the same time excluding details carrying lesser probative value that . . . poses a real risk of causing *unfair* prejudice."). And there could be a range of appropriate uses for such audio-recording evidence depending on the circumstances of the case, the parties' theories, and the settled practices in the particular circuit. *Compare Franco*, 136 F.3d at 628 ("We find no abuse of discretion in the district court's decision not to play the tapes in full for the jury. The tapes were lengthy and the conversations were conducted in a language [i.e., Spanish] that most or all of the jury did not understand."), *with United States v. Cruz*, 765 F.2d 1020, 1024 (11th Cir. 1985) ("The district court played the tape recording for the jury and had an interpreter signal the jury when it was appropriate to turn the pages of the transcript. This procedure enabled the

(continued...)

harmless.  We ultimately hold that it was *not* harmless, compelling us to reverse

and remand this case to the district court.  We undertake this analysis in turn.

**1**

Our analysis begins with determining, first, whether the district court

abused its discretion in admitting the transcripts while excluding the recordings in

violation of the best-evidence rule.  Before conducting this inquiry, however, we

must determine, as a threshold matter, whether the best-evidence rule applies here

at all.  As noted, Rule 1002 generally requires the admission of the "original . . .

recording" where the proponent seeks "to prove its content."  FED. R. EVID. 1002.

For purposes of this rule, a "'recording' consists of letters, words, numbers, or

their equivalent recorded in any manner."  FED. R. EVID. 1001(b).  The "content"

of an audio recording, in turn, refers to "the spoken words or other audible sounds

it contains."  31 WRIGHT ET AL., *supra*, § 7184.  Finally, under this rule, "[a]n

---

[14](...continued)
jury to detect changes in voice modulation and note any hesitancies or other characteristics which might give meaning to the tape recording.").  Notably, in *Franco*, the Ninth Circuit discerned no reversible error where (1) "the district court made clear that it would entertain requests to play specific portions of tape when proffered at the appropriate point in the proceedings; [but] no such proffer was made"; and (2) the foreign-language "tapes were not sent into the jury room, but the jury was advised that it could listen to tapes upon request; [and] no request was made."  136 F.3d at 628–29.  On remand, the district court here should determine in the first instance—after considering the parties' arguments and *the settled practice of our circuit*—the appropriate use of the audio recordings during Mr. Chavez's new trial.

'original' of a . . . recording means the . . . recording itself or any counterpart intended to have the same effect by the person who executed or issued it." FED. R. EVID. 1001(d).

Here, the government unquestionably sought to prove the contents of the recordings. That is, it sought to prove the words purportedly spoken by Mr. Chavez and others in connection with the controlled methamphetamine purchases, as those words were captured on the recordings; indeed, as explicated below, these recordings were central to the government's case at trial. *See, e.g.*, R., Vol. III, at 39–43 (government grounding its opening statement repeatedly on the recorded conversations that allegedly took place between Mr. Chavez and others in connection with the controlled purchases); *see also id.* (government reiterating throughout opening statement that these purportedly incriminating conversations were captured on audio recordings, stressing, for instance, the following: Law enforcement agents "are listening to the wire. They can hear it over real time. They can hear what is happening."). Thus, in seeking to prove the recordings' contents, the government triggered the best-evidence rule. FED. R. EVID. 1002 advisory committee's note to 1972 Proposed Rules (noting that "[t]he rule is the familiar one requiring production of the original of a document to prove its contents" and that "[a]pplication of the rule requires a resolution of the question whether contents are sought to be proved"). Furthermore, none of the best-evidence

rule's exceptions apply here. *See, e.g.*, FED. R. EVID. 1003 (allowing the use of duplicates); FED. R. EVID. 1004 (enumerating exceptions to the requirement of an original). At bottom, the best-evidence rule is controlling here.

Having determined that the best-evidence rule applies, we must determine whether it was violated. We conclude that it was. Because the government sought to prove the contents of the three recordings concerning the alleged drug buys from Mr. Chavez, it was required under the best-evidence rule to secure admission of the "original" recordings themselves; that is, the three audio recordings that the translation transcripts purported to reflect. This, the government did not do. At trial, it proffered instead the transcripts, and the transcripts only, as proof of the recordings' contents. *See, e.g.*, R., Vol. III, at 175–76 (moving to admit Exhibits 16 and 17 as substantive evidence of what was allegedly said and heard on the recordings); *see also, e.g.*, Aplee.'s Resp. Br. at 3 (noting that "the United States offered translated transcripts of the recorded controlled purchases as evidence"). As the government itself has recognized, at no point did it even seek the admission of the underlying recordings. *See* Oral Arg. at 20:32–20:41 ("The United States did not admit the tapes into evidence. The United States could have; we had the tapes; we had the tapes available . . . , but we did not introduce those tapes at trial."). And in turn, the district court, over Mr. Chavez's repeated objections on best-evidence-rule

grounds,[15] admitted all three transcripts as the *sole* proof of the recordings'

contents—without admitting (or even listening to) the recordings. *See id.* at 23:44–23:49

("The district court never reviewed those recordings . . . . We did not [proffer them].").

The district court's decision to admit the transcripts—transcripts that were

proffered to prove the contents of the original recordings—*without* admitting the original

recordings themselves plainly flies in the face of the best-evidence rule and was an abuse

of the court's discretion. *See Wright v. Farmers Co-Op of Ark. & Okla.*, 681 F.2d 549,

553 n.3 (8th Cir. 1982) ("The transcription offered as evidence in this case clearly was

not the 'original' statement, nor could it be considered a 'duplicate.' Moreover, plaintiffs

clearly intended it as proof of the original statement's content. Thus, absent the

applicability of an alternative provision for admissibility, Rule 1002 would mandate

exclusion of the transcribed statement." (citations omitted) (first quoting FED. R. EVID.

1001(3), and then quoting FED. R. EVID. 1001(4), 1003)).

In a seeming attempt to elude the best-evidence rule's ambit, the government

makes much of the fact that the recordings "were all in Spanish," contending that this

"alters the analysis under the Best Evidence Rule." Aplee.'s Resp. Br. at 10–11. Under

---

[15]    *See, e.g.*, R., Vol. III, at 171 (objecting to the government's prospective introduction of the three transcripts without the recordings because "that offends the Best Evidence Rule"); *id.* at 174–75 (lodging objection to the government's introduction of the transcripts constituting Exhibits 16 and 17 on the ground that "the Best Evidence Rule applies"); *id.* at 230 (mounting objection to government's introduction of Exhibit 15 in light of the "[b]est evidence rule").

its view, recordings "in a language that jurors do not understand is not the best evidence," *id.* at 7; rather, "[w]hen a recording captures a foreign language conversation the [English-translation] transcript controls," *id.* at 12 (quoting *United States v. Ramirez*, 576 F. App'x 385, 388 (5th Cir. 2014) (per curiam) (unpublished)); *see also id.* at 13 (warning that construing the best-evidence rule to require admission of the underlying foreign-language recordings would have the "inevitable effect of . . . impos[ing] on future juries the impossible duty to endure—and to try and make sense of—what to them will surely be nothing more than indecipherable noise"). The government attempts to apply these principles here, arguing that "the 'best evidence' in this case was actually not an audio recording of [a] Spanish language conversation of the two controlled buys and set up call, none of which the jurors would have understood." *Id.* at 12–13; *see also id.* at 11 (reasoning that it would have "made no sense whatsoever to play those recordings to the jurors, who almost certainly would not have understood any of it[,]" because "the audio recordings of the controlled buys and the set up call were all in Spanish"). "Rather," it posits, "the 'best evidence' was the translated transcripts that [Mr. Chavez] agreed w[ere] accurate." *Id.* at 13.

The government's argument, however, holds no water. For starters, it evinces a fundamental misunderstanding of the legal import of the best-evidence rule. More specifically, the tacit premise of the government's argument is that the best-evidence rule calls for the admission of the evidence of the recordings' contents that is the "best" in a

47

qualitative sense. And, thus, the government reasons that because the recordings were in a foreign language that the jury did not understand, the English-translation transcripts actually were the best evidence, not the recordings themselves. But the government's premise is fatally flawed. Despite its somewhat misleading name, the best-evidence rule's concern is not with the admission of the best evidence in a qualitative sense. *See United States v. Smith*, 566 F.3d 410, 413 (4th Cir. 2009) ("The [best-evidence] Rule exists to afford guarantees against inaccuracies and fraud by requiring that *the original* of the document be offered, subject to exceptions . . . . Thus it is more accurate to refer to Rule 1002 as the 'original document rule,' not the 'best evidence rule.'"); *see also* FED. R. EVID. 1001 advisory committee's note to 1972 Proposed Rules (referring to the "misleading[ly] named 'best evidence rule'"); *supra* note 9. Rather, the "origins and subsequent history of the doctrine make clear that it was always narrowly applied to regulate just evidence of the contents of writings" and, in later times, recordings. 31 WRIGHT ET AL., *supra*, § 7181. Thus, whether the transcripts here are the "best" evidence of the contents of the recordings in a qualitative sense—as the government appears to believe—has no bearing on our analysis under the best-evidence rule, and we must therefore reject the government's argument in this respect.

The government's argument also misconstrues the best-evidence rule's scope. In contending that "the translation-foreign language element alters the analysis under the Best Evidence Rule," *see* Aplee.'s Resp. Br. at 10, the government is, in effect, arguing

that there is an exception to the clear dictates of the best-evidence rule for recordings in a foreign language. Under the plain language of the Federal Rules of Evidence, however, no such exception exists, nor has one been carved out in our caselaw. To the contrary, as we have explicated at length, *supra*, the plain meaning of the Rules of Evidence, our abiding common-law principles, and a long line of cases in this and other circuits make pellucid that "evidence concerning the contents of the recording of [a] foreign-language conversation is subject to the best evidence rule." 31 WRIGHT ET AL., *supra*, § 7184 n.17.1. Put simply and directly, for purposes of our best-evidence-rule analysis, it is immaterial whether the recordings were in Spanish, and the government's contentions to the contrary must be rejected.

In addition to its faulty legal underpinnings, the government's argument is also predicated on a false factual premise. The government has repeatedly represented and implied on appeal that "the recordings were completely in Spanish." Oral Arg. at 17:55–17:57; *see, e.g.*, Aplee.'s Resp. Br. at 11 ("[T]he audio recordings . . . were all in Spanish."); *see also, e.g.*, *id.* at 2 (claiming that "[b]oth [Mr. Salas] and [Mr. Chavez] spoke Spanish during the entirety of th[e] [July 22] transaction," the audio recording of which "was translated and transcribed into Exhibit 15"). But the transcripts themselves squarely belie the government's representations,[16] as they show that the contents of each

---

[16] We accept the contents of the transcripts at face value strictly for purposes of the instant discussion. As explicated below, however, we ultimately
(continued...)

49

recording were at least partly in English. For example, of the forty-six intelligible

statements in Exhibit 16, no fewer than seven of them—about fifteen percent of the

transcript's content—are either partly or entirely in English. *See* R., Vol. IV, Ex. 16 at

1–3, 6, 8–10 (Statements 6, 12, 35, 44–47). *But see* Aplee.'s Resp. Br. at 2–3

(representing that "[Mr. Salas] and [Mr. Chavez] both spoke Spanish during the entirety

of the [August 3] transaction," the audio recording of which was purportedly evinced in

the Exhibit 16 transcript).

The best-evidence rule's command is clear: a court may not admit a transcript of a

recording to prove the contents of that recording unless the recording itself is admitted or

an express exception to the best-evidence rule applies. The district court plainly violated

that command and, as such, abused its discretion. *Tan*, 254 F.3d at 1207 (noting that "[a]

district court abuses its discretion if its decision is based upon an error of law" (quoting

*Cherry*, 217 F.3d at 814)).[17]

---

[16](...continued)
find them to be saddled with serious problems that substantially call into question
their integrity.

[17]    Notably, Federal Rules of Evidence 702 and 403—the rules upon
which the Dissent predicates its position—play no role whatsoever in the
government's contrary arguments for affirmance. *See* FED. R. EVID. 702
(enumerating the requirements for expert testimony); FED. R. EVID. 403
(providing that "[t]he court may exclude relevant evidence if its probative value is
substantially outweighed by a danger of," *inter alia*, "unfair prejudice, confusing
the issues, [or] misleading the jury"). Though, as we have seen, the government
vigorously advocates for affirmance, it mentions nary a word in its briefing
concerning the expert-testimony principles of Rule 702 or the various concerns,
(continued...)

50

such as juror-confusion, that animate Rule 403. Indeed, the government's briefing never cites those rules at all. And with respect to Rule 702 specifically, neither party even intimates in its briefs that the transcripts at issue here were admissible as expert testimony. All this is not entirely surprising, given the circumstances of this case. As the Dissent concedes—albeit only in its closing five pages—the government did not present Trooper Scimone as an expert, nor did the district court qualify him as such. Indeed, the government never gave formal notice that Trooper Scimone would be offering expert testimony, much less move to admit the transcripts as Trooper Scimone's expert testimony. And, as for Rule 403, the district court here was never positioned to conduct the multi-factor balancing that Rule 403 requires because, as the government acknowledged during oral argument, it never even provided the audio recordings to the district court for its consideration. *See* Oral Arg. at 23:44–23:49 ("The district court never reviewed those recordings . . . . We did not [proffer the recordings]."); *see also United States v. Mangiameli*, 668 F.2d 1172, 1176 (10th Cir. 1982) (noting that "the trial court, under Rule 403, may exclude otherwise admissible evidence *after* balancing its probative value against certain competing considerations set forth in the rule and concluding that the costs of the evidence outweigh its benefits" (emphasis added)); *accord United States v. Espinosa*, 771 F.2d 1382, 1406 (10th Cir. 1985); *cf. United States v. Willis*, 826 F.3d 1265, 1271, 1273–74 (10th Cir. 2016) (articulating the factors that must be balanced in a sexual-assault case to which Rule 413 applies).

Undaunted, the Dissent crafts arguments for affirmance completely *sua sponte* and, more specifically, without the benefit of the parties' adversarial exchange. As a jurisprudential matter, this is imprudent, and—under these circumstances, where we have demonstrated (with reference to the parties' arguments) that Mr. Chavez's conviction rests unjustly on legal error—it is troubling. "[T]he adversary system is a cornerstone of our jurisprudence." Bryan A. Garner et al., THE LAW OF JUDICIAL PRECEDENT 226 (2016). Indeed, the very notion of "judicial precedent implies that the point to the decision . . . should have been argued by opposing counsel." *Id.* (quoting John F. Dillon, THE LAWS AND JURISPRUDENCE OF ENGLAND AND AMERICA 233 (1894)). This adversarial testing serves important ends: notably, it increases the odds that the court will "reach the 'correct' decision because the advocates will uncover and present more useful information and arguments . . . than the court would develop on its own."

## 2

That the district court abused its discretion does not end our inquiry, however. Even where we have determined that the district court has so erred, "we still may not grant relief if the district court's error was harmless." *United States v. Washington*, 653 F.3d 1251, 1270 (10th Cir. 2011); *United States v. Blechman*, 657 F.3d 1052, 1067 (10th Cir. 2011) ("We will not reverse a defendant's conviction on the basis of the district court's erroneous admission of . . . evidence if the error was harmless to the defendant."); *see* FED. R. CRIM. P. 52(a) ("Any error, defect, irregularity, or variance that does not

[17](...continued)
Adam A. Milani & Michael R. Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245, 273 (2002). After all, "[c]ounsel almost always know a great deal more about their cases than we do." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (R. Arnold, J., concurring in denial of reh'g en banc)). To be sure, appellate courts have the "discretion to affirm on any ground adequately supported by the record." *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). But ordinarily, in exercising that discretion, we have been—as a matter of basic fairness—"guided" by whether the parties have "fully briefed and argued" the alternate ground, and whether they have had "a fair opportunity to develop the factual record." *Brown v. Perez*, 835 F.3d 1223, 1236 (10th Cir. 2016) (quoting *Elkins*, 392 F.3d at 1162). These circumstances are conspicuously absent here. Accordingly, we deem the Dissent's *sua sponte* handiwork to be, again, not only imprudent, but—under these circumstances, where Mr. Chavez's demonstrably infirm conviction hangs in the balance—troubling. Because the parties have not had an opportunity to engage with the merits of the Dissent's arguments, neither will we.

affect substantial rights must be disregarded"). "A non-constitutional error, such as a decision whether to admit or exclude evidence, is considered harmless 'unless a substantial right of [a] party is affected.'" *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (alteration in original) (quoting FED. R. EVID. 103(a) (1999)). An error affecting a substantial right of a party is an error that "had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *United States v. Roach*, 582 F.3d 1192, 1207 (10th Cir. 2009) (quoting *United States v. Bornfield*, 145 F.3d 1123, 1131 (10th Cir. 1998)). In other words, "reversal is appropriate where an error has a substantial influence on the outcome of a trial or leaves one in grave doubt as to whether it had such effect." *United States v. Richter*, 796 F.3d 1173, 1197 (10th Cir. 2015). "By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

In determining whether an error had such an effect on the outcome of a trial, we "should not consider the error in isolation, but rather should consider it in the context of the entire record." *United States v. Irving*, 665 F.3d 1184, 1209 (10th Cir. 2011) (quoting 28 MOORE'S FEDERAL PRACTICE § 652.03[1], at 652–8 (3d ed. 2011)). To that end, our analysis entails an examination of the following: (1) "the context, timing and use of the erroneously admitted evidence at trial," *United States v. Hanzlicek*, 187 F.3d 1228, 1237 (10th Cir. 1999); (2) "how [that evidence] compares to properly admitted evidence," *id.*;

53

and (3) "whether the district court's instructions to the jury mitigated [the] error," *Richter*, 796 F.3d at 1197; *see United States v. Hands*, 184 F.3d 1322, 1332 (11th Cir. 1999). "The burden is on the government to establish the harmlessness of any error." *Washington*, 653 F.3d at 1270; *United States v. Holly*, 488 F.3d 1298, 1307 (10th Cir. 2007) ("It is well-established that the burden of proving harmless error is on the government.").[18]

---

[18] The government includes some harmless-error statements in its brief. But these statements amount to little more than a few cursory sentences baldly insisting that any error here "would necessarily have been harmless on this record," accompanied by a single case citation, providing a generic recitation of the harmless-error standard. Aplee.'s Resp. Br. at 13; *see also id.* at 13–14 (asserting, without elaboration, that "it would be purely fanciful to even imagine that such an error could have had *any* discernible effect on the outcome of this case, never mind the kind of 'substantial influence' on the jury's verdict that would be required for it to have been anything other than harmless" (quoting *United States v. Nance*, 767 F.3d 1037, 1043 n.5 (10th Cir. 2014))). Simply claiming that an error is "harmless," however, does not make it so; more is required from the government to secure harmless-error review. Seeing as the government has not meaningfully engaged with the issue of harmlessness, we question whether it has even made a harmless-error argument adequate to warrant our review. *See, e.g.*, *United States v. Faust*, 795 F.3d 1243, 1248 n.4 (10th Cir. 2015) (noting that, where a party "does not elaborate on [its] bare assertion[,] . . . we may rightly deem any argument that could be based on it to be waived"); *United States v. Pursley*, 577 F.3d 1204, 1231 n.17 (10th Cir. 2009) ("Under our precedent, this skeletal reference is insufficient to raise the [appellant's] concern as a discrete appellate issue."). We need not definitively opine on this waiver question, however, because even if we exercised our discretion to conclude that the government's skeletal statements are sufficient to raise the issue of harmlessness for our review, they lack the power to persuade us in light of our analysis below and thus do not alter our conclusion. *See United States v. Lente*, 647 F.3d 1021, 1037 (10th Cir. 2011) ("Harmlessness must be proven by a preponderance of the evidence, and the burden of making this showing falls on

(continued...)

Viewing the district court's erroneous admission of the transcripts (without the audio recordings) through this lens, we hold that the government has failed to carry its burden. That is to say, the error here was not harmless. Several reasons underlie our conclusion: (1) the transcripts assumed a central role in the government's case, which is especially problematic because their defects and omissions make their integrity and soundness questionable, (2) the government's other evidence was far from overwhelming, and (3) the district court's jury instructions failed to mitigate the error and, indeed, probably exacerbated it. We expound on these reasons below.

**a**

In performing our harmless-error analysis, we begin by considering the nature of the erroneously admitted evidence, with an eye toward "the context, timing and use of the erroneously admitted evidence at trial." *Hanzlicek*, 187 F.3d at 1237. As part of this inquiry, we consider "the strength, importance, and pervasiveness of the erroneously admitted [evidence]." *Richter*, 796 F.3d at 1197. That is to say, a determination that the wrongly admitted evidence figured prominently in the government's case militates in favor of holding that the error was not harmless. *See, e.g.*, *United States v. Tome*, 61 F.3d

---

[18](...continued)
the beneficiary of the error—in this case, the government." (quoting *United States v. Cerno*, 529 F.3d 926, 939 (10th Cir. 2008))); *see also, e.g.*, *id.* at 1038 ("The government bears the burden to show that the error did not affect the sentence. Its argument consists of assertions that the district court considered the § 3553(a) factors and that a different sentence on remand is 'highly unlikely.' That is not enough.").

1446, 1455 (10th Cir. 1995) (concluding that the improper admission of evidence was not harmless where that evidence "was extremely compelling"); *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc) (holding that the erroneous admission of expert testimony was prejudicial where the testimony was "pervasive").

Here, in prosecuting Mr. Chavez for methamphetamine distribution, the government's case was predicated on two events: the July 22 and August 3 controlled purchases. *See, e.g.*, R., Vol. III, at 39–40 (the government, in previewing its case during opening statements, informing the jurors that throughout trial they would "hear evidence about two incidents of distribution of a controlled substance, specifically methamphetamine"). The government argued that Mr. Chavez was the so-called "boss" or lynchpin in connection with the July 22 and August 3 transactions, acting as "the one that made the deliveries [of methamphetamine]" and as "the one [Mr. Salas] purchased methamphetamine from on those two dates." *Id.* at 44–45.

The transcripts played a significant role in establishing this theory at trial—doing so, not infrequently, in a problematic and potentially misleading manner. To begin, Exhibits 16 and 17 explicitly identify Mr. Chavez as one of the individuals who was present at and involved in the August 3 controlled buy. Specifically, in the legends at the top of the two transcripts, Mr. Chavez's name is expressly listed as one of the speakers on the recording. *See id*., Vol. IV, Ex. 16 at 1 (identifying "Randolfo Librado Chavez" as one of the speakers on the recording); *id.*, Ex. 17 at 1 (same). In effect, the transcripts

56

treat Mr. Chavez's participation in the drug transactions as an established (even stipulated) fact; this is particularly significant when we consider that not a single one of the testifying agents who surveilled the scene on August 3 was able to identify Mr. Chavez as a participant in the drug transactions, much less the orchestrator of those transactions (as discussed *infra*). Stated otherwise, viewed from a perspective of harmfulness, the evidence reasonably could be deemed significant because it squarely undercut a central leg of Mr. Chavez's defense, which relied on pointing out the lack of government proof of his participation in the controlled drug buys. *Id.*, Vol. III, at 45–46 (highlighting in his opening statement the purported paucity of government evidence linking him to the events of July 22 and August 3). Thus, from the outset, the transcripts expressly imbued the jury (at a minimum) with the understanding—without sightings from the agents to support it—that Mr. Chavez participated, in some capacity, in at least the August 3 transaction and—because of the common nexus of Mr. Salas—possibly the July 22 one as well.

Adding further color to the jury's understanding of Mr. Chavez's supposed involvement in the drug-trafficking events of July 22 and August 3, the transcripts purport to reflect recordings of "controlled buys" involving methamphetamine. Take Exhibit 15, for example. It purports to capture a conversation pertaining to the July 22 controlled purchase. *See id.*, Vol. IV, Ex. 15 at 1 (entitled "Transcript of audio 7-22 Controlled Buy"). The transcript's only explicit reference to a methamphetamine transaction,

57

however, is the introductory, internally made statement by an unidentified law-enforcement officer that the transcript relates to "a control[led] purchase of methamphetamine." *Id.* (Statement 1). In a similar vein, Exhibit 17 begins with the following internal statement by an unidentified officer: "[t]his will be a recorded call to Randy . . . . to arrang[e] the purchase of approximately 4 ounces of methamphetamine." *Id.*, Ex. 17 at 1 (Statement 1). This statement unambiguously links Mr. Chavez to the sale of methamphetamine, despite the absence of *any* reference to "methamphetamine" whatsoever within the transcribed conversations themselves. In other words, it is notable that *not once* does the word "meth" or "methamphetamine" appear within the text of the transcribed statements of the alleged participants in the July 22 and August 3 transactions, including Mr. Chavez. Yet, what effectively amounts to editorial commentary in these transcripts—commentary made by unidentified speakers not subject to cross-examination—directly implicates Mr. Chavez in the sale of methamphetamine. *Cf. United States v. Grinage*, 390 F.3d 746, 751–52 (2d Cir. 2004) (upon review of defendant's conviction for possession with intent to distribute the drug PCP, concluding that improper admission of case agent's interpretations of calls involving defendant was not harmless where "[t]here was no reference to PCP or drugs on the calls [themselves]").

Further, the transcribed conversations themselves constitute strong—albeit, again, problematic and potentially misleading—evidence of Mr. Chavez's supposed leading role in effectuating the controlled purchases. Exhibit 16, for example, attributes various

58

statements to Mr. Chavez, including "I can get pills," R., Vol. IV, Ex. 16 at 8 (Statement 44), and "I'm like the boss. I'm your boss. I can get you anything you want," *id.* at 10 (Statement 51). And Exhibit 17 reflects a back-and-forth allegedly between Mr. Chavez and Mr. Salas about whether it is "[t]hree thousand dollars . . . for the four," with Mr. Chavez stating that "[i]t was thirty-six, at least." *Id.*, Ex. 17 at 2 (Statements 17, 20). When those statements are then viewed through the lens of the unidentified officer's introductory commentary, they strongly imply that their subject matter was the price of methamphetamine. Put simply, these statements deeply implicated Mr. Chavez in the very methamphetamine-related offenses he was charged with, despite the lack of any explicit indication within the operative text of the transcripts themselves that the conversations concerned methamphetamine at all, and despite Mr. Chavez's insistence that the government lacked proof that he participated in the controlled buys, let alone coordinated them.

Thus, the transcribed conversations inexorably pointed toward Mr. Chavez's culpability—indeed, his leading role—in these two transactions and consequently had the power to prejudice him. *See Holton*, 116 F.3d at 1540 (noting risk of prejudice "when a transcript attributes incriminating statements to a defendant that the defendant does not admit making"); *cf. United States v. Berry*, 64 F.3d 305, 309 (7th Cir. 1995) (Rovner, J., concurring) ("[I]t is difficult to imagine evidence that would be more prejudicial to the defendant than a transcription of a conversation in which he allegedly sold crack cocaine

59

to a government informant, where the transcription identifies him as the speaker and the sole issue in the case is who was speaking during the transaction.").

It cannot be gainsaid, moreover, that the transcripts played a significant role during the trial. Indeed, at essentially every turn of the proceedings, the transcripts figured into the government's case. In its opening statement alone, the government made four explicit references to "the wire" that was used to generate the audio recordings—the contents of which the government contended were reflected in the transcripts. *See* R., Vol. III, at 40–43. And throughout the government's presentation of its case, references to—as well as witness examinations regarding—the transcripts were constant and extensive. For instance, the government engaged in a lengthy examination of Special Agent Ruby concerning the transcripts, having him read substantial portions of Exhibits 16 and 17 into the record for the jurors. *See, e.g.*, *id.* at 242–44, 258–61.

Finally, in closing statements, the government not only placed the transcripts front and center at multiple points, but in so doing underscored some of the most incriminating statements in them: it highlighted, for instance, that Mr. Chavez (supposedly) had said, "I am like the boss." *Id.* at 344 (referring to *id.*, Vol. IV, Ex. 16 at 10). Even in its concluding line at trial the government again referenced the transcripts, stating that Mr. Chavez "was the person who said he was the boss on the wire, and the boss is the one that did this. We ask that you find him guilty." *Id.* at 361; *see Hands*, 184 F.3d at 1332

("When assessing the effect of the evidentiary error upon the case as a whole, we also must consider the prosecutor's closing argument.").

Based on the foregoing, it seems clear to us that the government's reliance on the transcripts at trial was repeated and extensive, which militates in favor of a conclusion that the (improperly admitted) transcripts may have had a substantial influence over the jury's guilty verdict. *See, e.g.*, *United States v. Taylor*, 210 F.3d 311, 316 (5th Cir. 2000) (holding that defendant's "substantial rights were affected by the presence of and repeated references to the government's [erroneously admitted evidence]"); *United States v. DeSantis*, 134 F.3d 760, 770 (6th Cir. 1998) (holding that error was not harmless "in light of[, *inter alia*,] the repeated references the prosecution made" to improper evidence that was materially suggestive of the defendant's guilt).

That the transcripts occupied a central role at trial is especially problematic because defects and omissions inhering in them make their integrity and soundness questionable. As an initial matter, the transcripts offer no indication of who created them, when or how the respective transcribers did so, how much time elapsed between the making of each successive statement within the three transcripts, and whether these exhibits reflect a complete transcription of the underlying recordings, to name a few problematic aspects of them. Indeed, at oral argument, the government admitted that Trooper Scimone did not prepare the transcripts and that it did not call as witnesses the actual transcribers for logistical reasons. *See* Oral Arg. at 24:00–24:35; *see also supra*

61

note 6. Put simply, there was no information before the district court and the jury regarding the identities of the transcribers, nor the methodology that they employed. And we have no such information before us now.

Furthermore, as to Exhibit 15 specifically, it is likely *not* a complete transcript of the recording of the July 22 controlled purchase: one agent testified that he and his fellow law enforcement agent could hear "other people talking" to Mr. Salas, R., Vol. III, at 106, but the transcript is silent as to what those other people may have said, *see id.*, Vol. IV, Ex. 15 at 2 (Statements 5–7), to say nothing of who the speakers may have been.

Exhibit 16 is beset by several such problematic issues. For one, numerous words or phrases labeled "unintelligible" in the Spanish column are not deemed as such in the English-translation column; i.e., they are effectively deemed intelligible in the English column. Take Statement 36, for example:

| 36.<br>00:41:03,<br>840 --><br>00:41:10,<br>460 | B | Pues que se quede,<br>porque<br>[ininteligible] es<br>todo lo que<br>tenemos...<br>[ininteligible] | Yeah yeah but these guys<br>are on my ass. Because<br>last time it was short<br>about half an ounce. I<br>can get killed over<br>this.<br>] |

*Id.*, Ex. 16 at 7 (Statement 36). With respect to this statement attributed to Mr. Salas, the term "unintelligible"[19] appears twice in column three (i.e., Mr. Salas's statement as it was

---

[19] *See supra* note 4, concerning the occasional presence of the word "ininteligible" in the Spanish-language text of the transcript.

purportedly originally heard on the recording), but it does not appear anywhere in column four (i.e., the purported English translation of Mr. Salas's statement found in column three). This discrepancy raises a question: how are these words or phrases that are denoted "unintelligible" in Spanish somehow deemed to be intelligible in the English translation? It is unclear. And this discrepancy is only the tip of the iceberg: while thirty-nine words or phrases are designated as "unintelligible" in column three of this transcript, *see id.* at 1–11 (Statements 2, 4–6, 8–10, 12, 14, 16–18, 25–28, 30, 34–38, 40–41, 43–45, 47, 50–51, 53), fourteen of those words or phrases are not designated as such in column four, *see id.* at 4, 6–10 (Statements 18, 34–38, 43–44, 47, 50–51).

Exhibit 16 is saddled by another discrepancy. At least eighteen statements, as they appear in columns three and four of the exhibit, respectively, appear to reflect conflicting accounts of what was said on the recording. *Id.* at 1, 3–10 (Statements 6, 12, 18, 25, 27, 29, 31, 34–36, 38, 44–47, 50–52). Statement 52 exemplifies this issue:

| 52. 00:44:48, 300 --> 00:44:52, 460 | R | Tenemos que pagarle al otro wey... | Fucking 19 grams, We have to pay the other guy. |
| | B | | Is this your number? |

*Id.* at 10 (Statement 52). The Spanish text in column three consists of six words in Spanish, followed by an ellipsis, and attributed to a single speaker (i.e., Mr. Chavez). The English-translation text in column four, by contrast, consists of a full fourteen words,

comprising a fully punctuated sentence—*viz.*, without an ellipsis—that is attributed to one speaker (i.e., Mr. Chavez), as well as a question attributed to a second speaker (i.e., Mr. Salas).  We are hard pressed to discern how a purported translation could generate such a sharp disparity between the foreign-language and English-language versions.

In a similar vein, Exhibit 17 contains perplexing discrepancies such as the one below:

| 13. | V2 | Momento, momento. (unintelligible) ¿Cuánto decías que eran unos tres mil...? | Just a moment. Just a moment. Did you say it was about three sound...? |
|-----|-----|-----|-----|

*Id.*, Ex. 17 at 2 (Statement 13).  The text in column three reflects an "unintelligible" portion of the recording, while the text in column four bears no indication of unintelligibility.  How is this so?  Again, we are left with nary an explanation—exposing further problematic cracks in what is essentially a critical part of the government's case.

In short, the transcripts went to the heart of the government's case: not only did they purport to show Mr. Chavez's involvement in the July 22 and August 3 controlled purchases, but they also put in high relief Mr. Chavez's supposedly leading role in the exchange of methamphetamine for cash.  They did so, however, in a tenuous and problematic manner—their contents repeatedly raising serious questions regarding whether they truly reflected the contents of the recordings in the first place, *viz.*, serious questions concerning the integrity of the transcripts.

Accordingly, given the central role that the transcripts played in the government's case, and their inherently problematic and potentially misleading nature, our first inquiry strongly inclines us to at least have grave doubt about whether the transcripts had a substantial influence on the outcome of the trial; if we ultimately have such doubt, the district court's admission of Exhibits 15, 16, and 17 would be non-harmless. *United States v. Medina-Copete*, 757 F.3d 1092, 1109 (10th Cir. 2014) ("The harmless-error doctrine does not require us to precisely measure the damage caused by [the impermissible] testimony. It is sufficient for us to say that we have 'grave doubt' about the outcome of this trial . . . .").

**b**

As part of our harmless-error analysis, in addition to assessing the nature of the erroneously admitted evidence itself, we also consider "the overall strength of the other evidence against the defendant." *Blechman*, 657 F.3d at 1069. The salient inquiry here is this: removing the erroneously admitted evidence from the equation, how strong—or not—was the government's case at trial? In that regard, we have held that where the other (properly admitted) evidence that the government adduced was "overwhelming," the error stemming from the improperly admitted evidence was harmless. *United States v. Perez*, 989 F.2d 1574, 1584 (10th Cir.1993) (en banc); *see also United States v. Turner*, 285 F.3d 909, 914–15 (10th Cir. 2002) (holding that other evidence properly admitted at

65

trial was "sufficiently strong" to permit the conclusion that the erroneous admission of unreliable testimony was harmless).

The other evidence that the government adduced at Mr. Chavez's trial, however, was far from overwhelming. Indeed, putting aside the inadmissible transcripts, the government's evidence establishing that Mr. Chavez participated in the two controlled buys, much less orchestrated them, was not strong.

More specifically, in evaluating the strength of the government's case, the evidence that it did *not* produce is telling. For instance, the government did not produce any photographic evidence of Mr. Chavez participating in the controlled buys. *See* R., Vol. III, at 299. Nor did the government proffer any forensic evidence linking Mr. Chavez to the methamphetamine that Mr. Salas allegedly procured from him. *Id.* at 281–82 ("Q. Was there any effort at least to attempt to try and lift fingerprints off of those [sic] packaging? A. I do not recall. . . . Q. Most certainly that is not in the evidence, is it? Fingerprints lifted from the packaging is not [in] evidence; is that right? A. No, sir."). Nor did the government present evidence corroborating that the individual with whom Mr. Salas spoke by telephone in advance of the August 3 controlled purchase was—as the government represented at trial—Mr. Chavez. *Id.* at 279–80 (upon questioning about the identity of the individual on the other end of Mr. Salas's calls, a law-enforcement agent explaining that he (i.e., the agent) "did not identify the defendant," given that the

66

communications were placed from "prepaid" phones that are "commonly used by people who don't want to have phone numbers or phones associated with them").

Finally, the government did not adduce a shred of law-enforcement testimony directly linking Mr. Chavez to the controlled buys. More specifically, none of the law enforcement agents were able to observe whether drugs even changed hands during the controlled purchases, nor were they able to hear on the recordings any express mention of drugs. *See, e.g.*, *id.* at 106 (Agent Lile's testimony) (testifying that "[m]yself and [another agent] were not obviously parked . . . right on top of where the buy went down, so we could not see everything that happened"); *id.* at 112 ("Q. From what you observed what you actually saw, you didn't see the actual transaction take place; is that correct? A. It is."); *id.* at 123 (Agent McDonald's testimony) ("Q. Were you able to see any particular detail of what happened between the two cars? A. I wasn't able to see a lot of detail. I could see the two cars meet, but I didn't have eyes on the informant. That wasn't my role.").

Indeed, of the law enforcement officers examined at trial—whom, the government assured the jury, had eyes on the scene the entire time—not a single one among them was able to confirm that Mr. Chavez was present at the scene of the two controlled buys on July 22 and August 3, much less participated in them. Indeed, in one witness examination after the other, the agents acknowledged that they were unable to make out exactly who was in the white car from which Mr. Salas had purportedly procured the

methamphetamine. *See, e.g.*, *id.* at 106 (Agent Lile's testimony) (explaining that in light of where he was parked at the scene, what he "definitely could understand" was that "Mr. Salas had met with another party, because there were other people talking"); *id.* at 133 (Agent Preston's testimony) ("Q. [W]ere you able to observe [Mr. Salas] while he was [in the Old Chicago parking lot]? A. No. . . . Q. [Y]ou weren't able to see his car or any other vehicles at Old Chicago? A. I -- I can't -- no, I do not believe that we had eyes on him the whole time. Q. Or at least you did not? A. I did not."); *id.* at 188 (Officer Vos's testimony) ("Q. To this day, you don't know . . . who was in that [white] vehicle from observing the vehicle -- the people at the time, on July 22nd, 2016, you didn't know who was in that vehicle, correct? A. Correct.").

To be sure, an officer did positively identify Mr. Chavez as one of the individuals in the white car when he stopped it shortly after the August 3 controlled purchase. *See id.* at 305. However, the "mere presence at the scene of a drug transaction, without more, is insufficient to support a conviction for aiding and abetting." *United States v. Williamson*, 53 F.3d 1500, 1515 (10th Cir. 1995); *accord United States v. Ibarra-Diaz*, 805 F.3d 908, 932 (10th Cir. 2015); *cf. United States v. Anderson*, 189 F.3d 1201, 1207 n.3 (10th Cir. 1999) (distinguishing "those cases [where] we have held that a defendant's mere presence at the scene of a crime, even with knowledge that the crime is being committed, is insufficient to support an aiding and abetting conviction"). Therefore, it logically follows perforce that such presence would hardly constitute strong evidence that a defendant was

the principal-cum-boss of the drug transaction. *Cf. United States v. Verners*, 53 F.3d 291, 294–95 (10th Cir. 1995) ("The case against [the defendant] for possession with intent to distribute is far weaker [than that against her co-defendant] and presents a close question. Although there is ample evidence that she had knowledge of the presence of the drugs in the kitchen and sufficient evidence to show constructive possession of these drugs, there is little, if any, evidence of her intent to distribute. The government did not, for example, offer any evidence that she actively participated in either the manufacture or distribution of the drugs."). Therefore, though the officer's identification of Mr. Chavez in the white vehicle shortly after the August 3 controlled purchase was "certainly probative evidence" bearing on Mr. Chavez's guilt, it did not add much to the strength of the government's case. *Williamson*, 53 F.3d at 1516.

At bottom, the *only* evidence the government adduced that affirmatively linked Mr. Chavez to the controlled purchases was the testimony of Mr. Miranda and Mr. Salas. But their credibility was open to question. *Hands*, 184 F.3d at 1330 n.23 (explaining that "[h]armless error review, unlike a determination of the sufficiency of the evidence, does not require us to view witnesses' credibility in the light most favorable to the government" (citing *United States v. Marshall*, 173 F.3d 1312, 1318 n.15 (11th Cir. 1999))). More specifically, Mr. Miranda, who had been indicted along with Mr. Chavez, pleaded guilty to one count of distribution of methamphetamine and testified at trial in the hopes of receiving a reduced sentence. *See* R., Vol. III, at 193–94 (Mr. Miranda attesting

to his awareness of the portion of his plea agreement providing that the government had the discretion to recommend a downward departure from his otherwise applicable sentencing range upon determining that he had fully cooperated with the government); *see also* U.S.S.G. § 5K1.1 (providing for downward departures from the otherwise applicable U.S. Sentencing Guidelines range for offenders who have provided "substantial assistance" to the government); *Hands*, 184 F.3d at 1330–32 (in connection with harmless-error analysis, finding that government's other evidence adduced at trial was insufficient in part because its main witnesses "[e]ach had pled guilty to narcotics offenses, and each testified in the hope of receiving a reduced sentence or reduced charges," thereby calling into question their credibility).

Mr. Salas's credibility was open to question for a similar reason: as he himself averred at trial, he agreed to serve as a confidential informant for the express purpose of having a misdemeanor theft charge removed from his record. *See* R., Vol. III, at 136–38. Calling his credibility into further question was his unauthorized methamphetamine acquisition from Mr. Miranda following the July 22 controlled purchase, as well as his DUI arrest. *See id.* at 149, 236–37.

To be sure, it could be reasonably argued that the aforementioned evidence that the government adduced was "sufficient to sustain the jury's verdict . . . as a purely legal matter." *United States v. Irvin*, 682 F.3d 1254, 1264 (10th Cir. 2012). But that would be answering the wrong question. *See Richter*, 796 F.3d at 1197. The controlling question

70

here is whether the improperly admitted transcripts had "a substantial influence on the outcome of [the] trial or leaves one in grave doubt as to whether it had such effect." *Id.* And, in light of the foregoing analysis, we feel constrained—absent some mitigating effect of the jury instructions, discussed *infra*—to answer this question in the affirmative because we would harbor at least grave doubt concerning whether the transcripts had a substantial influence on the outcome. *See Medina-Copete*, 757 F.3d at 1107, 1109 (concluding that the "properly admitted evidence" was sufficient to support the jury's guilty verdict, but concluding that the admission of the improper evidence was "not harmless" because the court had "'grave doubt' about the outcome of this trial").

**c**

We consider here whether the district court's instructions to the jury may have mitigated the substantial prejudicial effects of the improperly admitted transcripts.[20] *See Richter*, 796 F.3d at 1197; *United States v. Sanders*, 928 F.2d 940, 942 (10th Cir. 1991) (recognizing that a limiting instruction has the potential to cure any prejudice from the erroneous admission of evidence); *see also Hands*, 184 F.3d at 1329–35 (in assessing

---

[20]     To be clear, our analysis here regarding Jury Instruction 26 strictly concerns the issue of harmless error in connection with Mr. Chavez's first claim of error under the best-evidence rule (i.e., the district court's allegedly erroneous admission of the English-translation transcripts without the recordings themselves). This analysis is distinct from any analysis we might have conducted concerning Mr. Chavez's second claim of error, which asserts instructional error as to Jury Instruction 26. As we have previously stated, in light of our resolution of Mr. Chavez's first claim of error, we need not—and thus do not—reach his second claim.

whether an error is harmless, observing that "a limiting instruction regarding the [erroneously admitted] evidence" may help to "diminish[] its prejudicial impact"). In this regard, we determine that not only did the court's jury instructions not mitigate the prejudice arising from the improper admission of the transcripts, but they probably exacerbated that prejudice—leaving us confident that the district court's error must be deemed non-harmless. We expound on these reasons below.

The salient instruction here is Jury Instruction 26; therein, the district court instructed the jurors as follows:

> While in a case involving English recorded conversations and transcripts, the jury is routinely instructed that they are not bound by the transcript, that is because every juror is just as capable as the person preparing the transcript to tell what is being said on the recording. This is not so with Spanish conversations that have been introduced in this case. *The translated transcripts are the evidence you should rely on.* You are not free to reject the translation contained in the transcripts of the tape recordings given by Officer Scimone. You are, however, free to give this evidence whatever weight or consideration you deem to be justified . . . .

R., Vol. I, at 112 (emphasis added). Far from neutralizing the prejudicial effect of the improperly admitted transcripts, these instructions did precisely the opposite: the court required the jury to rely on the transcripts as the primary evidence of the conversations that the audio recordings purportedly captured and, notably, imposed none of the kinds of limitations on the use of such evidence that courts have determined mitigates prejudice. *See United States v. Garza*, 435 F.3d 73, 77 (1st Cir. 2006) (holding that error was harmless where "[t]he court instructed the jury that the transcripts were not evidence to be

72

considered in deciding th[e] issue [of whether the defendant was the participant in the drug deal that the transcripts described]").  Notably, the court did not instruct the jurors to determine whether the transcripts accurately reflected the speakers' identities—including, as important here, the identity of Mr. Chavez.  Rather, the court said nothing at all on the matter, thereby leaving the jury free to accept the transcripts' identification of Mr. Chavez, as well as their attribution to him of statements that (in the context of the transcripts as a whole) could hardly be anything other than significantly incriminating.

In short, the district court's jury instructions did nothing to diminish the substantial prejudicial effects of the improperly admitted transcripts; instead, the court's instructions probably exacerbated those effects.  As such, we are constrained to conclude that the district court's error in admitting those transcripts is non-harmless and reversible.

*  *  *

To recapitulate, the best-evidence rule embodied in Rule 1002 applied to Exhibits 15, 16, and 17—that is, English-translation transcripts that purportedly reflected the contents of audio recordings pertaining to alleged methamphetamine purchases on July 22 and August 3.  The district court erred under the best-evidence rule by admitting those transcripts without the audio recordings themselves.  And, because we harbor at least grave doubt concerning whether the transcripts had a substantial influence on the outcome of Mr. Chavez's trial, we deem that error non-harmless.

## III

For the foregoing reasons, we **REVERSE** and **REMAND** to the district court with instructions to **VACATE** Mr. Chavez's convictions and grant him a new trial.

17-8096, *United States v. Chavez*

**HARTZ**, **J**., Circuit Judge, dissenting.

The sin of the trial judge was to use his common sense. He ruled that a tape recording of a conversation in a language incomprehensible to the jury was inadmissible. And he ruled that the jury could receive an English-language translation of that recording when the accuracy of the translation was not disputed. If the Federal Rules of Evidence prohibited what the judge did, they would be obtuse. Fortunately, they do not. The advisory committee notes to the Rules, as well as academic commentary, support the judge's rulings. No federal appeals court has reversed a district court for admitting into evidence a translation without also admitting the original-language document or recording. And several federal appeals courts have endorsed exactly what the judge did at Defendant's trial.

Although the merits of the trial judge's logic seems obvious, this dissent will need to explore in some depth various rules-of-evidence matters that receive little attention from the judiciary or commentators. After that discussion the dissent will turn to the specifics of the case at hand.

But before explaining why the trial judge's rulings were correct—in particular, why they did not violate the Best Evidence Rule—I need to address some side issues that should not distract from the central error of the majority opinion. First, to say that the original recordings were properly excluded from evidence is not to say that they should have been withheld from Defendant. Obviously, the defense should have access to the originals so it can be sure that the translation is correct. But that is not an issue here.

Defense counsel told the district court that he had no complaints about timely access to the recordings and the translation.

Second, to say that the original recordings were properly excluded in this case is not to say that such recordings should always be excluded. There are a variety of reasons why a jury may benefit from hearing a recording even if the members do not understand the language. The recording may be helpful in identifying the speaker, assessing the tone of the conversation, etc. But Defendant did not adequately present such grounds to the judge. And the translation is admissible regardless of whether the recording is admitted.

Third, the majority opinion is correct in raising questions about inconsistencies in the transcripts in this case. For example, it is hard to see how six words in Spanish could be translated into 14 words of English. But Defendant did not adequately alert the trial judge to such flaws. Nor has he provided any basis for believing that the inconsistencies are material. They may have nothing to do with the accuracy of the translation (as opposed to errors in the transcription of what was said in Spanish). Moreover, defense counsel said that he had no concerns about the accuracy of the translation, never suggested an alternative translation, and to this day has not pointed to any error in the translation that could have influenced the jury. Defendant's position is that the translation should not have been admitted without the original recordings also being admitted. Yet he has failed to offer a single reason why the jury might have reached a different verdict if the recordings had also been admitted. (He has not even included the recordings in the record on appeal, which ordinarily would preclude him from arguing that exclusion of the recordings was reversible error.) In closing argument the prosecutor

2

quoted a few lines from the translated transcripts; but Defendant has not asserted, much less established, that those lines were mistranslations. When this case is retried, the recordings will be admitted into evidence and the translation will be provided to the jury. The only change in the evidence allowed will be that the jurors may be permitted to listen to a recording in a language they do not understand. Neither the majority opinion nor Defendant has explained why Defendant will be better off as a result. I need not address harmless error, but the majority opinion is singularly unpersuasive on that issue.

Further, it should not be surprising that Defendant did not attack the translation in district court. First, defense counsel conceded at trial that he was not aware of any material error in the translation. And second, contrary to the presentation by the majority opinion, the prosecution had a compelling case (which this dissent will summarize when it turns to the specifics of the trial) that informant Bryan Salas had purchased drugs from an occupant of specific cars on two occasions, and the recordings were largely irrelevant to the only real issue at trial—whether Salas had lied under oath about whom he had dealt with (that is, whom he was talking with during the recorded conversations) in the two cars. Nitpicking the translation would have accomplished nothing.

Finally, I should respond to footnote 17 of the majority opinion, which was added in response to my dissent. It eloquently explains why resolving this case under my analysis would be contrary to all principles of proper adjudication. Unfortunately, the footnote is also contrary to this circuit's precedent. That precedent emphasizes our duty to examine whether the lower-court decision can be affirmed. Twenty-five years ago we responded as follows to a suggestion from an appellant that we apply to the appellee our

3

rule that an appellant's contention is ordinarily considered waived if not raised in the

opening brief:

> [The appellant's] argument misconceives the roles played by the appellant,
> the appellee, and the court of appeals when a district court judgment is
> appealed. While the appellant challenges the district court's ruling, the
> appellee is only interested in maintaining the status quo, *i.e.*, an affirmance.
> Because the appellant comes to the court of appeals as the challenger, he
> bears the burden of demonstrating the alleged error and the precise relief
> sought. A court of appeals is not required to manufacture an appellant's
> argument on appeal when it has failed in its burden to draw our attention to
> the error below. In the event of such a failure, the court will ordinarily
> consider the appellant's point waived. Appellees bear no such burden.
> Though Fed.R.App.P. 28(b) requires the appellee's brief to contain
> arguments addressing the issues raised by the appellant, we have never
> characterized the appellee's obligation in terms of a categorical imperative.
> The distinction between appellant's and appellees' obligations under Rule
> 28 grows out of the court of appeals' freedom to affirm a district court
> decision on any grounds for which there is a record sufficient to permit
> conclusions of law, even grounds not relied upon by the district court. This
> broad power to affirm extends beyond the counter-arguments raised by the
> appellee; it includes any ground for which there is record to support
> conclusions of law. *Once the appellant alleges the district court erred, we*
> *have a duty to assess the validity of the appellant's allegations. This duty*
> *arises in part out of our relationship with the district court, and we may not*
> *neglect it simply because an appellee fails to defend adequately the district*
> *court's decision. To do so would open the door to a perverse jurisprudence*
> *by which properly decided district court decisions could be reversed.*

*Hernandez v. Starbuck*, 69 F.3d 1089, 1093–94 (10th Cir. 1995) (footnote, citations,

brackets, and internal quotation marks omitted). More recently, now-Justice Gorsuch

expressed the point as follows:

> [Our] reluctance to command do-overs in the district court is also why we
> treat arguments for affirming the district court differently than arguments
> for reversing it. *We have long said that we may affirm on any basis*
> *supported by the record, even if it requires ruling on arguments not*
> *reached by the district court or even presented to us on appeal. See United*
> *States v. Davis*, 339 F.3d 1223, 1227 (10th Cir.2003); *Griess v. State of*
> *Colo.*, 841 F.2d 1042, 1047 (10th Cir.1988); *see also S.E.C. v. Chenery*

4

*Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("[I]n reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason.") (internal quotation omitted). This preference for affirmance no doubt follows from the deference we owe to the district courts and the judgments they reach, many times only after years of involved and expensive proceedings. *Because of the cost and risk involved anytime we upset a court's reasoned judgment, we are ready to affirm whenever the record allows it. So it is that appellants must always shoulder a heavy burden—they must come ready both to show the district court's error and, when necessary, to explain why no other grounds can support affirmance of the district court's decision.*

*Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). Of course, before affirming on an unargued ground, it is often appropriate to request supplemental briefing from the parties. Such a request, however, is not a prerogative of a dissenter.[1]

In this case, there is an additional institutional reason for conducting the analysis addressed in this dissent. The analysis can provide essential guidance for courts in the future. I have expressed my view that the district court acted in accordance with common sense. Indeed, to my knowledge this is the first appellate decision reversing a district court for admitting a translation of a foreign-language recording while excluding the

---

[1] The majority opinion's other reasons for not addressing the dissent's arguments are unsound. There are no relevant factual disputes. There was nothing for the district court to weigh under Rule 403 because Defendant did not suggest how it would be helpful for the jury to hear the tape recordings. As for treating the translation as expert opinion and Lt. Scimone as a qualified expert, Defendant did not challenge the accuracy of the translation and Scimone's testimony (described later) undoubtedly qualified him as an expert. The majority opinion's footnote will unfortunately encourage lawyers to waste everyone's time with unnecessary requests for rulings on undisputed matters. As for notice to Defendant that Scimone would be giving expert testimony, the government provided notice of and access to the recordings and the translations in ample time to prepare for trial. Indeed, as a result of that notice and access, defense counsel stated that he had no concerns about the accuracy of the translation.

recording itself. Several circuit courts have affirmed the practice; the government's brief cites two such circuit opinions. But apparently no appellate opinions have explored how the Rules of Evidence operate in this context. I hope that this dissent provides a solid start for that exploration.

At least the majority opinion's footnote 17 serves one useful function. It makes clear that the opinion is not considering (and therefore not rejecting) the view of the Rules of Evidence taken in this dissent. Therefore, trial courts in this circuit, as well as panels of this court, are free to adopt that view if they find it persuasive. The only caution I would suggest is that to avoid reversal, trial courts explicitly cite the applicable Rules of Evidence (perhaps in the future it would be wise to cite Rule 802 when excluding hearsay) and make a determination of the expert qualifications of the translator, even when the parties stipulate that the translation is accurate.

## I.    ANALYSIS

### A.    The Nature of Testimony Translating Documents or Recordings

A proper analysis of this case must begin with an examination of the nature of evidence translating material that originated before trial. A witness who testifies to the English meaning of something expressed in a foreign language is undoubtedly an expert. Not just anyone is permitted to provide such testimony. The translator must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The witness is expressing an opinion about the English meaning of what was said in a foreign language. What the witness testifies to is an opinion even though there may be broad agreement about the meaning by those fluent in both English and the foreign language.

6

Such agreement is not that unusual with expert opinion and does not mean that the opinion is less than expert. If a suspect leaves a good DNA sample at the scene of a crime, there will be little disagreement among experts about whether the sample matches the DNA of the defendant. There will be plenty of x-rays that every competent radiologist interprets as showing a particular type of fracture.

Experts are called as witnesses because they are capable of drawing inferences from information that the lay people on a jury are incapable of properly analyzing. If the jurors were capable of properly analyzing the information, then the expert testimony would be unnecessary and inadmissible, because it would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). If jurors were required to draw relevant inferences from the information on which the expert relies for his or her opinion, they might be left at sea and likely to reach unsubstantiated or even irrational conclusions. That would certainly be the case if the jurors were left on their own to determine the meaning of a document or conversation in a language they did not understand.

The information on which an expert relies may be admissible evidence that is presented to the jury, but that is not required. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. Indeed, the evidence may be inadmissible precisely because jurors are incapable of evaluating it, would have to speculate about its importance, and could draw highly inappropriate inferences. In that circumstance the trial court could properly say that the information

7

upon which the expert relies is not relevant under Federal Rule of Evidence 402 or is inadmissible under Federal Rule of Evidence 403 because its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Yet it would be eminently reasonable for the expert to be permitted to rely on the identical information.

The interplay of Rules 402 and 403 with Rule 703 has particular impact when a statement or conversation in a foreign language is relevant to issues being litigated. The trial court may reasonably decide that Rule 402 or 403 requires exclusion of a foreign-language document or recording. If the issue is the meaning of the foreign words, the document or recording will not be helpful to an English-speaking jury. On the contrary, the jury may be misled or confused if it tries on its own to translate the words or sounds. But under Rule 703 the inadmissibility of the document or recording does not foreclose the admissibility of a translation of it into English by a qualified expert.

What about the Best Evidence Rule? On its face it seems to require that the original in the foreign language be admitted if the translation is to be presented to the jury. The core of the Rule is: "An original writing, recording, or photograph is required in order to prove its content . . . ." Fed. R. Evid. 1002. I will assume that a translation of a document or recording "prove[s] its content."[2] So it might seem that before a party can prove the content of the original document or recording by providing a translation, the

---

[2] *But cf. Romo v. State*, 941 N.E.2d 504, 508 (Ind. 2011) (admission of transcripts of translations of foreign-language recordings is not governed by Indiana's Best Evidence Rule, Ind. R. Evid. 1002, since playing the recordings "would not serve the purpose of the rule because it could not prove any content to the jury.").

8

Rule requires that the original be admitted. That presents quite a conundrum. Why should the Rules of Evidence require the admission of an incomprehensible original when the translation is what the jury must rely on? The answer is that the Rules have no such requirement.

Rule 703 solves the conundrum by, as previously noted, permitting admission of the expert translation without requiring admission, or even admissibility, of the document or recording on which the translation is based. And it does so without violating the Best Evidence Rule, because the Rule recognizes exceptions. The full text of Rule 1002 is: "An original writing, recording, or photograph is required in order to prove its content *unless these rules or a federal statute provides otherwise*." Fed. R. Evid. 1002 (emphasis added). And Rule 703 provides otherwise. In fact, the advisory committee note to Rule 1002 recognizes that Rule 703 limits the scope of the Rule. It states: "It should be noted . . . that Rule 703 . . . allows an expert to give an opinion based on matters not in evidence, and the present rule [Rule 1002] must be read as being limited accordingly in its application." To say that the Rule is limited in its application by Rule 703 is to say that Rule 703 overrides it; that is, Rule 1002 does not apply when the writing, recording, or photograph serves only as the basis for expert testimony. The expert can base an opinion on, for example, an original writing even if the writing is not admitted. As observed by the author of a leading treatise on evidence, "For all purposes, Rule 703 creates an exception to the original writing rule, Rule 1002." Michael H. Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness*, 1986 U. Ill. L. Rev. 43, 66 (1986).

In short, and perhaps unsurprisingly, the treatment of foreign texts and recordings by the Rules of Evidence comports with common sense.  Presenting the original foreign-language document or recording to the jury may only (1) waste the time of those jurors who rationally decide to ignore what is provided or (2) create a substantial risk of confusing or misleading those jurors who feel a responsibility to try to extract information from that evidence. The trial court should be allowed to exercise its discretion in determining whether the original should be presented to the jury. Sometimes it makes sense to admit the original; sometimes it does not.  But the decision on whether to admit the original should not affect the admissibility of the translation. The translation by a properly qualified expert will be helpful to the jurors regardless of whether there is anything about the original document or recording that could be of use to them.  The Best Evidence Rule "should never be applied so rigidly as to interfere with good trial sense."  6 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 1001.02 (Mark S. Brodin, ed., Matthew Bender 2d ed. 2018) ("Weinstein & Berger").

An error that infects the majority opinion's analysis is that it treats a translation as not being true evidence but only an aid to the jury in assessing evidence (the foreign-language recording).  But that cannot be.  Consider a defendant being prosecuted for fraud based on false statements in a document written in a foreign language.  If the translation of the document is not evidence, then the jury verdict cannot be based on it. The jury would have to base its verdict on the foreign-language document that no juror could understand.  How is that possible?  How could the jury know that the defendant

10

uttered a falsehood when it does not know the meaning of what the defendant said? Certainly, if no translation were provided during the trial, the appellate court could not affirm a conviction predicated on the meaning of a foreign-language document. The same would be true if a foreign-language oral conversation was essential to the verdict. Say, the only evidence that the defendant participated in a conspiracy consists of tape recordings of the defendant's conversations, all of which were in a language not understandable by the jury. How is the jury to find the defendant guilty without considering the meaning of the recorded conversations? It would not be enough to prove that the defendant (whose voice may be recognizable on the recording) had a conversation with a member of the conspiracy (whose voice is also recognizable). The translation is not *an aid* to understanding evidence, it is *the* evidence on which the jury's verdict must rest. In short, the translation of a document or conversation is undoubtedly evidence.

In a related error, the majority opinion suggests that a court can admit into evidence the original recording of a foreign-language conversation but refuse to allow the jury to listen to it. Again, how can that be? What in the world does it mean, then, to admit something into evidence? Surely it has something to do with consideration by the jury. But if the jury is barred from listening to the recording, how can it consider that recording (as opposed to considering a translation or transcript) in reaching its verdict? The majority opinion is forced into its absurd position by a combination of its erroneous view that the Best Evidence Rule requires that the recording be admitted and its recognition that the trial court can properly decide that allowing the jury to listen to the

11

recording could create confusion and misunderstanding. The majority may have a proper

concern that a translation not be admitted into evidence unless the opposing party has the

opportunity to examine the original foreign-language recording. But the trial court can,

and should, require that such an opportunity be afforded without having to admit the

original recording into evidence.

One source of the majority opinion's error is its alluring, but misguided, treatment

of a translation of a foreign-language recording as being essentially the same as a

transcript of an English-language recording. But ordinarily there is no expertise—no

need for expert opinion—in preparing a transcript of a conversation in the language that

all jurors understand. Rule 703 does not apply. Having a transcript in hand, a juror may

find it easier to follow an English-language conversation being played from a recording.

But the court will generally instruct the jurors that they must rely on what was heard

rather than what was printed out for them. The court does not want the jury to be unduly

influenced by the transcript. In other words, the transcript is not admissible into evidence

but may be a demonstrative exhibit that can assist jurors in processing the evidence

presented to them.

A translation from a foreign language is a different animal altogether. The jurors

must rely on the expertise of the translator and could not possibly rely on their individual

understandings of a recording in a language they do not know. If the translation is not

admissible in evidence, then the recording may have no probative value whatsoever. As

the Ninth Circuit has explained: "When tapes are in English, they normally constitute the

actual evidence and transcripts are used only as aids to understanding the tapes; the jury

12

is instructed that if the tape and transcript vary, the tape is controlling. When the tape is in a foreign language, however, such an instruction is not only *nonsensical*, it has the potential for harm where the jury includes bilingual jurors." *United States v. Franco*, 136 F.3d 622, 626 (9th Cir. 1998) (emphasis added) (citation and internal quotation marks omitted); *see United States v. Morales-Madera*, 352 F.3d 1, 9 (1st Cir. 2003) ("[A]n instruction that the jury should consider only what is on the tape and not what is in the [translated] English transcript would not be appropriate."); *United States v. Valencia*, 957 F.2d 1189, 1195 & n.16 (5th Cir. 1992) (similar), *overruling on other grounds recognized in United States v. Keith*, 230 F.3d 784, 786 (5th Cir. 2000).

A number of scholars and commentators (cited below) have distinguished between transcripts of English-language recordings and transcripts of foreign-language recordings in just this way. Transcripts of *English* recordings are presented to the jury not as evidence, but as demonstrative exhibits. Translations of *foreign-language* recordings, in contrast, are admissible as evidence, and the recordings themselves may well be inadmissible.

A leading treatise, after explaining why some courts treat transcripts of English recordings as only inadmissible demonstrative exhibits rather than as evidence, then discusses the contrary view and endorses it only for transcripts of recordings in a foreign language:

> Other courts dispute the notion that a transcript is merely demonstrative evidence that illustrates a recording. Under their approach, a transcript is admitted under the theory it is opinion testimony from the transcriber as to the meaning of those parts of the recording that are difficult to understand. Most commonly this theory is employed to justify the admission of a

13

transcript that translates a recording of a conversation in a foreign language. This theory deals with the best-evidence doctrine by reasoning that the transcript is not offered to prove the contents of the recording but, rather, to explain what inferences should be derived from it. Thus, courts adhering to this approach conclude that the transcript is no more objectionable under best evidence law than a physician's testimony concerning the meaning of an x-ray or a handwriting expert's testimony concerning the genuineness of handwriting.

*This approach makes sense where the transcript is a translation of a conversation in a foreign language since the author of the transcript clearly contributes expertise in the form of specialized knowledge concerning the language in question.* However, where a transcript is prepared just to clarify difficult-to-understand portions of a recording in English, it is hard to justify viewing the transcript as expert opinion testimony because the author of the transcript may not bring any special expertise to this task . . . .

Charles Alan Wright and Victor James Gold, 31 Fed. Prac. & Proc. Evid. § 7167 at 360–61 (emphasis added) (footnotes omitted).

A useful guide to the Federal Rules of Evidence states:

(6) Transcription of recordings. Transcriptions of recorded English-language conversations are often used to help the jury better understand what was said. *When, however, the recorded conversation is in a foreign language, it must be translated for the jury.* In such cases, translated transcriptions of audio recordings may be admitted into evidence. Some courts both play the recorded foreign-language conversation and admit the translated transcript. *Other courts admit the transcript without having the jury listen to the recording, reasoning that the jury will not profit from hearing a foreign-language conversation.*

Steven Goode and Olin Guy Wellborn III, Courtroom Handbook on Federal Evidence, FRE R 604 (2019 Westlaw) (emphasis added) (citations omitted).

Another treatise emphasizes that translated transcripts are independent evidence based on expert testimony:

*Translated transcripts. Where the audible record captures statements or conversations in a language other than English, a transcript in translation*

*is indispensable as a practical matter. . . .* The problem of assuring accuracy is compounded, and careful pretrial work by the parties under judicial supervision is essential. Neither the court nor the jury is likely to be qualified to determine the accuracy of the translation by comparing it with the audible record, and both depend heavily on persons fluent in English and the other language. In this instance, the transcript (or transcripts, if competing versions must be offered because of the failure of the parties to agree) *must be received as independent evidence, supported by the testimony of the translator, who must qualify as an expert*, and if the parties cannot agree on translation issues, competing transcripts should be allowed.

Christopher B. Mueller and Laird C. Kirkpatrick, 5 Federal Evidence § 10:15 (4th ed.

2019, Westlaw) (emphasis added) (footnotes omitted).

And at least two law-review articles explain that the translated transcript is

preferable to original foreign-language recordings.  First,

The courts disagree on whether the transcripts can be introduced as substantive evidence. Some courts believe transcripts should be introduced as substantive evidence, but only to aid to [*sic*] the jury in determining the real issue presented, the content, and the meaning of the tape recordings.  . . . *Generally tapes are virtually useless to the jury because they either cannot understand the tapes or must adhere to the transcript translation. The tapes may even confuse or mislead the jury, which provides a basis for excluding the tapes under Rule 403 of the Federal Rules of Evidence.* Therefore, listening to the tapes is more likely to prejudice the case than to aid the jury in rendering a fair determination.

Beth Gottesman Lindie, *Inadequate Interpreting Services in Courts and the Rules of*

*Admissibility of Testimony on Extrajudicial Interpretations*, 48 U. Miami L. Rev. 399,

418–19 (1993) (emphasis added) (footnotes omitted).  Second,

Some courts have treated the translations of audiotape recordings of conversations in a language other than English as aids for the jury and the non-English language audiotapes as the primary evidence. The translated transcript is considered a visual aid for the jurors while the audiotape recording is being played. *This approach makes little sense when the audiotape recording is in a language other than English.* Other courts have held that the purpose of the transcript is to assist the trier of fact in

15

understanding the foreign language spoken on the audio tape. Presumably, the judge and the jurors are not able to understand an audiotape in the non-English language. Furthermore, *there is potential danger that bilingual jurors will disagree as to the meaning of the conversation. The better line of cases holds that the translations and not the audiotapes in the non-English language are the best evidence.*

Charles M. Grabau & Llewellyn Joseph Gibbons, *Protecting the Rights of Linguistic Minorities: Challenges to Court Interpretation*, 30 New Eng. L. Rev. 227, 252 (1996) (emphasis added) (footnotes omitted).[3]

Several circuits have recognized the problems posed by recordings in a foreign language and have consequently endorsed the exclusion of the originals of foreign-language recordings while admitting translations. The Fifth Circuit, relying on Rule 403, affirmed a district court's refusal to play an original tape on the ground that doing so was more likely to confuse the jury than to help it. *See Valencia*, 957 F.2d at 1194–96. The Eighth Circuit likewise affirmed the exclusion of Spanish recordings on the ground that it was unlikely that the jury could discern relevant information from the recordings. *See United States v. Grajales-Montoya*, 117 F.3d 356, 367 (8th Cir. 1997); *see also United States v. Placensia*, 352 F.3d 1157, 1165 (8th Cir. 2003) ("We have . . . held translated

---

[3] There is no reason why a translation of a recording must be presented to the jury through a transcript. The translation could be read to the jury, perhaps by having different people read what was said by each voice on the recording. That was done in this case, with the reading being performed by the prosecutor and a law-enforcement officer. As an aid to the jury in following the presentation, a transcript of the translation was displayed on a screen. One advantage of this procedure is that it is unnecessary to provide the jurors with a copy of the transcript during their deliberations. Such a copy may overemphasize that particular evidence, which is one reason why judges do not provide jurors with transcripts of trial testimony (although they sometimes will have the court reporter read excerpts of testimony when deliberating jurors request it).

transcripts of foreign language tapes are admissible at the district court's discretion, even when introduced without the tape recordings."). So did the Seventh Circuit. *See United States v. Estrada*, 256 F.3d 466, 473 (7th Cir. 2001) ("[T]he district court saw no value in allowing a presumably English speaking jury to hear tapes that were recorded in Spanish."). As the Massachusetts Supreme Judicial Court summarized the matter, "A foreign language recording generally is not admissible in evidence unless there is relevant evidence discernible on the recording other than the content of the statements made by the participants in the conversation." *Commonwealth v. Portillo*, 968 N.E.2d 395, 400 (Mass. 2012).

Two points should be emphasized about these decisions excluding foreign-language recordings. First, these rulings in no way contradict the Best Evidence Rule. That Rule does not mandate the admission of anything. It is a rule of exclusion not of admissibility. It excludes copies from evidence; it does not ensure that every original document or recording must be admitted. The fact that a document or recording is not a copy does not mean that the jury must see it. If the original is irrelevant, who cares that it is not a copy? In particular, the above-cited judicial and academic authority supports the exclusion of foreign-language documents and recordings. Why introduce "evidence" that will "sound like Greek" to the jury? If the only issue regarding a document or recording in a foreign language is the meaning of what is said, it is hard to see why the untranslated original should be presented to the jury. *Cf. Romo*, 941 N.E.2d at 508 (admission of foreign-language translation transcripts is not governed by Indiana's Best Evidence Rule,

17

Ind. R. Evid. 1002, since playing those recordings "would not serve the purpose of the rule because it could not prove any content to the jury").

Second, I am not suggesting that Rules 402 and 403 always precludes admission of an original foreign-language recording. In some circumstances a recording may have probative value even for a jury that does not understand the meaning of the words spoken. For example, the recording may assist jurors in determining the identities of the speakers. And some circuits have expressed the view that it is "relevant to play [a foreign-language] tape to a jury that does not understand the substance of the conversation to show the mood or tone of the speakers, or the general context or ambiance of their conversation." *Valencia*, 957 F.2d at 1195 (internal quotation marks omitted) (although holding that the district court did not abuse its discretion in thinking otherwise and excluding the recording); *see United States v. Cruz*, 765 F.2d 1020, 1024 (11th Cir. 1985) (explaining that playing a Spanish recording could allow the jury "to detect changes in voice modulation and note any hesitancies or other characteristics which might give meaning to the tape recording"). Some circuits, however, see no potential relevance of a foreign-language recording. *See Grajales-Montoya*, 117 F.3d at 367 (the defendant "has suggested no reliable means of enabling people who do not speak Spanish to interpret inflections and tone, and we cannot think of any, either"); *Estrada*, 256 F.3d at 473 (quoting *Grajales-Montoya*).

Thus, the best-evidence question is not whether the original must be admitted, but whether the translation can be admitted into evidence even though the original has been excluded. And that question was answered above. As I have already explained, the Best

18

Evidence Rule says that ordinarily a copy is not admissible, but that general rule is qualified by the language "unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. And there is such an exception for expert opinion. Under Rule 703 the matters on which an expert relies in forming an opinion "need not be admissible for the opinion to be admitted," if experts in the field would reasonably rely on them. Of course, an expert translator would have to rely on the recording or document being translated.

The appellate cases relied on by the majority as requiring admission of the original foreign-language recording are not persuasive. Not one of the cases presented the issue before us on this appeal—namely, whether the trial court can admit into evidence a translation of a foreign-language recording when it has refused to admit the recording itself. In fact, the original recording was admitted in each of the cases. Some include dicta that it was necessary to admit the original, but none of those cases analyze the issue; in particular, they fail to recognize any problem with presenting a foreign-language recording to a jury that cannot understand what is being said, and they ignore the possibility that the doctrine requiring the introduction of original English-language documents or recordings may not apply to foreign-language material. Given these lapses, the dicta are hardly persuasive.

I begin with the three Tenth Circuit cases relied on by the majority opinion: *United States v. Verdin-Garcia*, 516 F.3d 884 (2008); *United States v. Gomez*, 67 F.3d 1515, (1995); and *United States v. Rivera*, 778 F.2d 591 (1985). All are readily distinguishable from the present case because the district court had admitted into

19

evidence the original Spanish-language recording and the defendant had not challenged admission of the recordings.  The issue now before us therefore was not considered by the court.  And the only dicta in these cases that might support part of the majority opinion's analysis is too ambiguous to be in any way authoritative.

In *Verdin-Garcia* the argument by the defendant on appeal was that the translations of the recordings were incorrect and should have been excluded.  In the paragraph of the opinion introducing this issue, the opinion merely stated an historical fact:  "The recordings themselves were admitted as substantive evidence; the translations were shown to the jury for demonstrative purposes only."  516 F.3d at 892.  I discern nothing in our opinion that approves or disapproves of what was done in that regard. (Also, the translator herself testified.  *See id.*  I assume her testimony was admitted as evidence.)

In *Gomez* a translator had testified "as a witness through whom the transcribed conversations were admitted into evidence."  *See* 67 F.3d at 1525.  We first rejected an unpreserved argument that the translator was not qualified.  *See id.* at 1525–26.  We also rejected a best-evidence argument "that the jury was never informed that the primary evidence was the tape itself not the transcripts; and they were never informed that, should they detect a discrepancy between the tape and the transcripts, the tape should control." *Id.* at 1526 (internal quotation marks omitted).  Because the issue had not been preserved below, the defendant could prevail only on plain-error review.  *See id.*  And his argument failed under that standard because "[t]he admission of transcripts to assist the trier of fact lies within the discretion of the trial court," the defendant's argument was "wholly

without merit," and the "record clearly reflects that the district court did not abuse its discretion in admitting the transcripts." *Id.* at 1527. We added a footnote, however, stating that "a cautionary instruction regarding the use of the transcripts as aids only in understanding the audio tapes would have been preferred, *see United States v. Robinson*, 707 F.2d 872, 877 (6th Cir. 1983)," although we said that no reversible error resulted from the absence of the instruction. *Id.* at 1527 n.15. Perhaps that dictum could be read to state that testimony translating a foreign-language recording is not admissible evidence. But I see no need to read it as making that improper statement. (It would be improper because, as discussed more fully above, if the jury cannot use the translation as evidence, how can it make any finding based on the meaning of the foreign-language conversation?) The quoted statement refers to a transcript. The transcribed conversation was in both English and Spanish, *see id.* at 1518 n.2, and the English portion of the transcript was not admissible but merely a jury aid. (The *Robinson* decision cited in our footnote involved a transcript of an English conversation, and the concern was audibility.) Further, the translator testified, *see* id. at 1525, so the translation may well have been presented orally, making the entire transcript only a jury aid. I think it would be misguided to treat an ambiguous dictum, which was largely true, as authority for a further proposition that is patently unreasonable.

As for the final case*, Rivera*, the district court had submitted to the jury during its deliberations some Spanish-language recordings and transcripts of the recordings. *See* 778 F.2d at 600. The defendant complained that "submission of the tapes to the jurors placed the one Spanish-speaking juror in the position of an expert on translation of the

21

almost entirely Spanish conversations in the tapes." *Id.* We did not say that submission of the tapes to the jurors was required. We said only that the jurors had the English transcripts to examine, "the inflections and emphasis in the conversations may have been significant," and we would not presume prejudice but rather presume that the jurors were true to their oaths and observed the court's instructions. *Id.* In other words, there may have been a relevant purpose for listening to the recordings, and we would presume that there had not been misconduct by the jurors, so there was no reversible error. This is not a declaration that failure to play the tapes would have been reversible error. To say that doing X is not reversible error is slim support for the proposition that not doing X is reversible error. Particularly on questions of admission of evidence, we defer to the trial court, often being willing to affirm whichever way it decides.

Likewise, none of the out-of-circuit cases relied on in the majority opinion on this point considered a challenge like the one raised by Defendant here. That is, none considered whether the district court erred by admitting translations of foreign-language recordings when the recordings themselves were not admitted into evidence. In each case, the recordings had been admitted.

In two of the cases, there was not even a foreign-language recording; the court discussed only how to handle recordings and transcripts of recordings in English. *See United States v. Holton*, 116 F.3d 1536 (D.C. Cir. 1997); *Government of Virgin Islands v. Martinez*, 847 F.2d 125, 128 (3d Cir. 1988). Some cases are apparently cited by the majority opinion simply as examples where the foreign-language recordings, and sometimes the English transcripts, were admitted into evidence (although in at least one

case the recordings were never played to the jury). *See United States v. Abonce-Barrera*, 257 F.3d 959, 962–64 (9th Cir. 2001) (Spanish tapes were played, English translations were read to the jury, and the jury received transcripts of both. Defendant unsuccessfully challenged the qualifications of the translator, the quality of the tapes, and the opportunity to review the translations and transcription.); *United States v. Franco*, 136 F.3d 622, 625–29 (9th Cir. 1998) (Recordings were placed in evidence but not played for the jury because they were in a foreign language. The jury was told it could request recordings be played during deliberations, but no request was made. English transcripts were also placed in evidence, but only 18 of 110 were read in full to jury. The appellate court said that it is nonsensical to say that a transcript translation of a foreign-language tape is only an aid to understanding.); *United States v. Garcia*, 854 F.2d 1280, 1282–83 (11th Cir. 1988) (While listening to the recording of a conversation that was in both Spanish and English, the jury was provided an English-language transcript; the jurors were told that they should determine the reliability of the transcript; the transcript was not submitted to the jury during deliberations.).

Several other cases cited by the majority opinion state, or quote the trial judge as stating, that a translated *transcript* is not admissible in evidence and is merely an aid for the jury. But they do not say that *testimony* by a translator is inadmissible, so their concern may be limited to use of the document; and in any event, they fail to explain how the jurors are to discern the meaning of the foreign-language conversation if they cannot treat a translation as evidence. *See United States v. Nunez*, 532 F.3d 645, 649–52 (7th Cir. 2008) (The defendant objected that the English-language transcript of a Spanish

23

conversation denoted code words for drugs with quotation marks or footnoted definitions; the appellate court said that the trial court had erred by telling the jury that it could afford evidentiary weight to the transcript, but there was no reversible error because the translators had testified to the meanings of the terms and the instruction to the jury did not allow it "to consider evidence of the code words' meaning that was not already in evidence apart from the transcripts."); *United States v. Ben-Shimon*, 249 F.3d 98, 100–01 (2d Cir. 2001) (rejecting challenge to use at trial of transcript of conversation in English and Hebrew, where judge instructed that transcript was only an aid in listening to recording); *United States v. Martinez*, 951 F.2d 887, 888 (8th Cir. 1991) (The defendant challenged the admission of tape recordings because they were of such poor quality and challenged the admission of what he termed inaccurate transcripts. The appellate court says the admission of tapes is within the discretion of the trial court. The transcripts were not admitted into evidence; the judge said that only the tapes, and not the transcripts, were to be considered when weighing the evidence.).

The last case cited by the majority opinion (actually the first one it cites), *United States v. Morales-Madera*, 352 F.3d 1 (1st Cir. 2003), is unique in that it concerned a trial in Puerto Rico, where the jury was probably more fluent in the foreign language (Spanish) than in English. *See* Andrea Freeman, *Linguistic Colonialism: Law, Independence, and Language Rights in Puerto Rico*, 20 Temp. Pol. & Civ. Rts. L. Rev 170, 185 (2011) (2006 survey by United States Census Bureau reported that 95.2% of Puerto Rico's population speak Spanish at home). The Jones Act, 48 U.S.C. § 864, however, requires that federal trials there be conducted in English. The central evidence

was 52 recordings of wiretapped conversations in Spanish. *See* 352 F.3d at 4. The defendant's chief complaints on appeal were that a translator did not translate the recordings into English as they were played and, relevant here, English-language transcripts were not marked as exhibits or admitted in evidence. *See id.* The court held that it was error not to admit the English transcripts in evidence and that "an instruction that the jury should consider only what is on the tape and not what is in the English transcript would not be appropriate." *Id.* at 9. But the failure to admit into evidence the transcripts that were presented to the jury was not plain error requiring reversal when the issue had not been raised below. *See id.* at 10–12. In the course of its discussion, the court included the following sentence: "*The best evidence rule requires that the tape recording themselves must be furnished*, absent agreement to the contrary, but does not require that English translations of those tapes be excluded from evidence." *Id.* at 9 (emphasis added). The majority opinion quotes the emphasized portion of the sentence to support its basic thesis—namely, that the Best Evidence Rule requires the admission of foreign-language recordings. But the focus of the First Circuit opinion was the second clause of the sentence. In explaining why the transcripts needed to be admitted as evidence, the court wanted to point out that the Best Evidence Rule "does not require that English translations of those tapes be excluded from evidence." The statement that the rule requires admission of the recordings was dictum, since the recordings had been admitted and no challenge was raised with respect to that admission. And the only case authority cited by the court in support of its statement was an opinion that involved an English-language recording in a Missouri trial. *See United States v. Warner,* 204 F.3d

25

799 (8th Cir. 2000). Moreover, I would think that in Puerto Rico the admission of an original recording in Spanish would create little chance of confusion, given the high likelihood that almost all the jurors could understand it. In a Puerto Rico trial a judge might reasonably decide that a Spanish-language tape should be treated for best-evidence purposes as an English-language recording would be treated in the other federal courts. The First Circuit in *Morales-Madera* had no occasion to consider the problems that might arise in presenting a Spanish-language recording to a jury that did not understand the language. Not so in Wyoming.

To sum up, the admission into evidence of foreign-language recordings is problematic because the jury is likely to misunderstand the content of anything said. They should probably be admitted if the party seeking admission can explain how listening to the recording could help the jury resolve a material issue (such as the identity of the speakers). Otherwise, their admission should be within the discretion of the trial judge. As far as I can tell, every circuit court to consider the matter has reached the same conclusion. There appear to be no cases in which a federal circuit court has reversed a district court that excluded a foreign-language recording from evidence on the ground that it would be more likely to confuse than to enlighten the jury. The inadmissibility of the foreign-language recording does not, however, foreclose the admission into evidence of a translation of what was said on the recording. That is because the translation is expert opinion and under Federal Rule of Evidence 702 such opinion can be admissible even when the material on which it is based is not admissible. This feature of Rule 702 supersedes the Best Evidence Rule, Rule 1002. The expert opinion of the translator can

26

be offered to the jury as testimony or, by stipulation of the parties, through a transcript. If the opinion is offered as testimony, a transcript may be provided to the jury as an aid in following the testimony but ordinarily should not be admitted into evidence, just as a transcript of an English-language recording should ordinarily not be admitted.

With this as background, I now turn to the particulars of Defendant's trial.

### B.    Application to This Case

The prosecution's case against Defendant was strong. The two drug transactions for which he was convicted were both controlled buys by confidential informant Bryan Salas. A number of government witnesses testified to their roles in "controlling" the transactions by searching Salas before and after the transactions and keeping him under continuous surveillance between the two searches. For the first transaction, (1) Salas and his car were searched by law-enforcement officers for drugs or other contraband and he was given funds to buy drugs, (2) officers then continuously observed him before, during, and after he met the occupants of a white vehicle, and (3) Salas and his car were then searched again and he delivered methamphetamine to the officers. For the second transaction, Salas was (1) searched, (2) driven to a Walmart and given funds to buy drugs, (3) continuously observed by officers stationed in the Walmart while Salas waited inside for the transaction, (4) continuously observed by officers while he was outside the Walmart, including when he met the occupants of a white vehicle (not the same vehicle as on the first occasion), and (5) picked up at Walmart by officers who received methamphetamine from him and searched him. The white car was then continuously observed by law-enforcement officers until a local police officer stopped the car shortly

27

after the transaction. At trial the officer identified Defendant as the passenger in the car and testified that the passenger identified himself by stating Defendant's name.

Salas testified regarding each transaction and identified Defendant as the person he dealt with in the car who took his money and gave him the drugs. He identified the other people in the first car as Carlos Dominguez and McKleen Miranda. Miranda pleaded guilty to the methamphetamine sale and testified at trial, stating that he was the driver of the car and identifying Defendant as the passenger who took the money from Salas and gave him the drugs. Salas identified the people in the second white car as Defendant and Dominguez, and again testified that the transaction was conducted with Defendant.

For each transaction, Salas wore a recording device that transmitted to the officers. There are three tape recordings. Because their content is not important to the analysis, I leave an abbreviated description of their content to a footnote.[4]

---

[4] I will identify each recording by the same number as the exhibit that is the translated transcript of that recording. Tape 15 begins shortly before the first transaction. None of it purports to be a recording during the transaction. The only voices recorded are those of Salas and a police officer. Much of it is Salas telling the officer—in English—where he is traveling on the way to and from the transaction. The parts in Spanish are what Salas is saying to someone on the telephone. None of the transcript was read aloud at trial. It is highly doubtful that this recording could have had any significant impact on the jury.

Tape 17 is a recording of a telephone conversation between Salas and Defendant to set up the second transaction. It is almost all in Spanish except at the beginning, when the officer supervising the call describes the plan, and at the end, when the officer states that the conversation has ended and gives the time. During the conversation with the seller, everything is in Spanish except a few okays and the seller's saying "36, at least" and "He's going to fuck it up, fuck your money too, you know?"

Tape 16 is a recording of the second transaction. The first part contains Salas's side of some telephone conversations. After the first conversation Salas, speaking in

Transcripts were prepared for each recording. The transcripts purport to include all the intelligible Spanish and a translation of that Spanish together with whatever was said in English. Wyoming Highway Patrol Lieutenant Joseph Scimone testified to the accuracy of the translations and the transcripts. He testified that he grew up in a bilingual household speaking Spanish and English, that he had learned Spanish terms used in drug trafficking through his training and experience, that he had taught Spanish to new members of the Highway Patrol, and that he had previously testified in federal and state court about his translations from Spanish. He had listened to the recordings while reviewing a draft of the transcript and made corrections to the translation as appropriate. Salas testified to whom he spoke with on the recordings.

The three recordings and the transcripts were provided to defense counsel with ample time before trial. The transcripts were admitted into evidence. At trial, defense counsel stated that he had no complaints about the adequacy of the notice he received of the recordings or translations and said, "I don't challenge that they are accurate translations of what Trooper Scimone has heard or read." R., Vol. 3 at 95. He declined to ask any questions of Scimone.

During trial the contents of Exhibit 16 and 17 were presented to the jury by having the prosecutor and Agent Jason Ruby read them. The prosecutor read what was said by Salas and Dominguez. Ruby read what was said by Defendant. While they read each

---

English, tells the listening officers what the plan is. Then the recording has three voices, identified as Salas, Defendant, and (for a few words) the driver, Dominguez. Portions of the recorded conversation are in English.

29

transcript, the transcript was displayed on a screen in the courtroom. At no time during the recitation did defense counsel challenge the accuracy of the translation or complain that the reading of the transcripts to the jury did not reflect what was said (as translated into English when necessary) or what was unintelligible.

Because of the care by law-enforcement agents with respect to each controlled buy, there could be little doubt that on both occasions Salas traded money for methamphetamine with someone in each white car. The only question was whether Defendant was involved in the sale. And the only direct evidence of that came from Salas and Miranda. Thus, their credibility was the chief dispute in the case.

The tape recordings, however, were of little consequence on that issue, because the identification of the people with whom Salas spoke came solely from Salas and Miranda. For the tapes to be probative of Defendant's specific involvement in the transactions (and thus corroborate the accusations of Salas and Miranda), the jury had to believe Salas's identification of the voices. The defense therefore focused on impeaching the credibility of Salas and Miranda, particularly on the ground that they were receiving leniency for their own crimes. And by the same token, the specific words spoken in the transcripts were of minimal concern. It is fair to assume that the defense had little interest in nitpicking the translation in the transcripts because (1) a review of the recordings showed that the translations were essentially correct and (2) revisions to a word here or there would have no impact on the jury.

The majority opinion reverses Defendant's convictions because the three tape recordings were not admitted into evidence. The trial judge excluded them because the

30

Wyoming jury would not understand the Spanish. (Defense counsel had represented that "the vast majority of [the recording during the second transaction] is in Spanish." R., Vol. 3 at 267.) Under Federal Rule of Evidence 402, "Irrelevant evidence is not admissible." And under Rule 403, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Absent some explanation of why the recording would assist the jury in assessing the facts of the case, I would have thought that those two rules of evidence would surely support the district court's ruling.

In contrast, the English translations of the Spanish-language conversations were clearly relevant, since they informed the jury of what was said during the arrangements for and the conduct of the drug sales for which Defendant was convicted. The majority opinion declares, however, that the translations cannot be admitted into evidence unless the recordings themselves are admitted. For reasons I have already discussed at some length, I respectfully disagree. The translations of the recordings were expert testimony that is admissible regardless of whether the translated recordings themselves were admitted into evidence.

True, the government never proffered Lt. Scimone as an expert witness, and the district court never declared him qualified as an expert. But there was no need to do so since the translation was not challenged. Scimone clearly had the knowledge and experience to perform the translation. To be sure, it is not uncommon for an attorney putting on expert testimony to request that the court recognize the witness as an expert

31

and to obtain such recognition.  But that procedure is not required.  Opposing counsel

may decline to raise the issue of the witness's qualification as an expert because the

qualifications are clear and a judicial pronouncement that the witness is an expert may

lead the jury to give the witness's opinion excessive weight.  Indeed, having a judge

declare a witness to be qualified as an expert is generally frowned upon.  *See* Fed. R.

Evid. 702, 2000 advisory committee note ("[T]here is much to be said for a practice that

prohibits the use of the term 'expert' by both the parties and the court at trial.  Such a

practice 'ensures that trial courts do not inadvertently put their stamp of authority' on a

witness's opinion, and protects against the jury's being 'overwhelmed by the so-called

'experts.'").  The American Bar Association's Civil Trial Practice Standard 14 states:

"'Qualifying' Expert Witnesses.  The court should not, in the presence of the jury,

declare that a witness is qualified as an expert or to render an expert opinion, and

counsel should not ask the court to do so."  *ABA Civil Trial Practice Standard*

*14* (Aug. 2007) (available at

https://www.americanbar.org/groups/litigation/policy/civil_trial_standards/);[5] *see*

---

[5]  It is worth quoting in full the comment to the standard:

> It is not uncommon for a proponent of expert testimony to tender an expert
> witness to the court, following a recitation of the witness's credentials and
> before eliciting an opinion, in an effort to secure a ruling that the witness is
> "qualified" as an expert in a particular field. The tactical purpose, from the
> proponent's perspective, is to obtain a seeming judicial endorsement of the
> testimony to follow. It is inappropriate for counsel to place the court in that
> position.
>
> A judicial ruling that a proffered expert is "qualified" is unnecessary unless
> an objection is made to the expert's testimony. If an objection is made to an
> expert's qualifications, relevancy of expert testimony, reliability or any

32

other aspect of proffered expert testimony, the court need only sustain or overrule the objection. When the court overrules an objection, there is no need for the court to announce to the jury that it has found that a witness is an expert or that expert testimony will be permitted. The use of the term "expert" may appear to a jury to be a kind of judicial imprimatur that favors the witness. There is no more reason for the court to explain why an opinion will be permitted or to use the term "expert" than there is for the court to announce that an out-of-court statement is an excited utterance in response to a hearsay objection.

Because expert testimony is not entitled to greater weight than other testimony, the practice of securing what may appear to be a judicial endorsement is undesirable. As United States District Judge Charles R. Richey has observed in a related context, "It may [ ] be an inappropriate judicial comment . . . for the court to label a witness an 'expert.'" Hon. Charles R. Richey, *Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" Under the Federal Rules of Evidence in* Civil and Criminal Jury Trials, 154 F.R.D. 537, 554 (1994). The prejudicial effect of this practice is accentuated in cases in which only one side can afford to, or does, proffer expert testimony.

When the Advisory Committee on the Federal Rules of Evidence recommended what became the December 1, 2000 amendment to Fed. R. Evid. 702, it cited Judge Richey and ended the Advisory Committee Note accompanying the amendment with the following paragraph:

> The amendment continues the practice of the original Rule in referring to a qualified witness as an "expert." This was done to provide continuity and to minimize change. The use of the term "expert" in the Rule does not, however, mean that a jury should actually be informed that a qualified witness is testifying as an "expert." Indeed, there is much to be said for a practice that prohibits the use of the term "expert" by both the parties and the court at trial. Such a practice "ensures that trial courts do not inadvertently put their stamp of authority" on a witness' opinion, and protects against the jury's being "overwhelmed by the so-called 'experts.'" Hon. Charles Richey, *Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" Under the Federal Rules of Evidence in Criminal and Civil Jury Trials*, 154 F.R.D. 537, 559 (1994) (setting forth limiting instructions and a standing order employed to prohibit the use of the term "expert" in jury trials) .

33

This Standard suggests that the court should not use the term "expert" and that the proponent of the evidence should not ask the court to do so. The party objecting to evidence also has a role to play in assuring that the court does not appear to be anointing a witness as an "expert." A party objecting that a witness is not qualified to render an opinion or that a subject matter not the proper subject of expert testimony should avoid using the word "expert" in the presence of the jury. Any objection in the presence of the jury should be "to the admissibility of the witness' opinion." If the objecting party objects that testimony is inadmissible "expert" testimony and the court overrules the objection, it may appear that the judge has implicitly found the witness to be an "expert." When an objection is made, if the proponent wishes to argue the matter, it should be outside the hearing of the jury. *See* Fed. R. Evid. 103(c) (providing that inadmissible evidence should not be heard by the jury).

The utility of the Standard can be undermined if the court is not careful to excise the term "expert" from the instructions it gives to the jury before it deliberates. Juries can be fully instructed on their role in assessing credibility without any mention of the term. The following instruction is illustrative:

> Some witnesses who testify claim to have special knowledge, skill, training, experience or education that enable them to offer opinions or inferences concerning issues in dispute. The fact that a witness has knowledge, skill, training, experience or education does not require you to believe the witness, to give such a witness's testimony any more weight than that of any other witness, or to give it any weight at all. It is important for you to keep in mind that the witness is not the trier of fact. You are the trier of fact. It is for you to decide whether the testimony of a witness, including any opinions or inferences of the witness, assists you in finding the facts and deciding the issues that are in dispute. And, it is for you to decide what weight to give the testimony of a witness, including any opinions or inferences of the witness.

6 Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, Federal Rules of Evidence Manual 144 (8th ed. 2002).

34

*United States v. Nixon*, 694 F.3d 623, 629–31 (6th Cir. 2012) (adopting standard 14); *United States v. Bartley*, 855 F.2d 547, 852 (8th Cir. 1988); 29 Wright & Miller § 6264.3 (2d ed.).

I recognize that this court has not prohibited trial judges from declaring in open court that a witness is an expert (although perhaps we should). But we have never prohibited the parties and the court from proceeding in accordance with the better practice recommended by the ABA Standard and the advisory committee on the Rules of Evidence.

In this case the government called Scimone as a witness, asked him to describe his background, which clearly established his ability to translate from Spanish into English, and elicited the witness's endorsement of the translation in the transcript. Defense counsel did not object. There was nothing more that the court needed to do or should have done. *See Gomez*, 67 F.3d at 1525 ("Mr. Gomez did not object at trial to the admission of the expert testimony and, therefore, the issue is not properly before this court." Only review for plain error would be proper.); 4 Weinstein & Berger § 702[6][a] ("[O]f course, reliability determinations are necessary only if the opponent objects to the admissibility of the expert testimony. In the absence of an objection, rulings admitting or excluding expert testimony without a reliability determination are reviewable only for plain error."); *United States v. Cristerna-Gonzales*, 962 F.3d 1253, 1260 (10th Cir. 2020) ("To begin with, we question whether there is any error in admitting expert-opinion testimony without a judicial ruling on the witness's qualifications when no objection has been raised to the testimony. A comment to ABA Civil Trial Practice Standard 14 states

the Bar's understanding that '[a] judicial ruling that a proffered expert is "qualified" is unnecessary unless an objection is made to the expert's testimony.'" ).  The Federal Rules of Evidence Manual states the point succinctly:  "The rules set forth [evidence Rules 104, 615, 702, 703, 704, 705, and 706] are triggered when a timely objection is made to expert testimony.  Unless a timely objection is made, the evidence will be admitted."  Federal Rules of Evidence Manual § 7-2[c].

The majority opinion suggests that Scimone's testimony was inadmissible because he did not reasonably rely on the draft of the transcript prepared by unidentified other people.  This suggestion is puzzling.  Scimone testified that he listened to the recorded conversation and that the transcript, as edited by him, was an accurate translation of the conversation.  It is not as if those who prepared the draft translation had access to anything or performed any test that Scimone did not.  He listened to the same recordings that they did.  There is nothing to indicate that he deferred to someone else's translation.  It is irrelevant what person (or even computer program) prepared the draft, because Scimone testified that he made corrections so that the transcript presented in court was, in his view, an accurate translation.[6]  The only thing he "relied" on other than his own expertise was the recording itself.  Moreover, Defendant never challenged Scimone's qualifications to testify to his translation or his reliance on anything he used to perform the translation.  Indeed, he did not challenge the accuracy of the translation.

---

[6]  Perhaps his corrections to the translation account for the apparent discrepancies between the translation column and the column that included the original Spanish.  He may have deciphered what had been labeled as unintelligible.

36

A final comment on whether the recordings should have been admitted into evidence. Defendant's sole argument at trial was that they had to be admitted under the Best Evidence Rule if the translations were to be admitted. I have already explained why that argument fails. He could have argued that the recordings should be admitted because they were relevant. But he did not do so. The trial judge saw no point in playing tapes that were in a foreign language unfamiliar to the jurors. I recognize that parts of the recording were in English, but Defendant's arguments have exclusively focused on the Spanish-language conversation, and he has not explained how he was prejudiced by the jurors' not hearing the English portions. Defense counsel said nothing that would disabuse the trial court of its conclusion that no purpose would be served by playing the recording. In any event, Defendant has waived any claim that the tapes would be relevant by not making them part of the record on appeal.

In short, the district court's rulings did not violate the Best Evidence Rule. Defendant's conviction should be affirmed.